UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-cv-10921-RGS

| | |
|---|---|
| INTERNATIONAL SALT COMPANY, LLC<br>    Plaintiff,<br><br>v.<br><br>CITY OF BOSTON<br>    Defendant. | |

**DEFENDANT CITY OF BOSTON'S PRETRIAL MEMORANDUM**

## I.    Introduction

This matter arises out of a contract the City awarded to the International Salt Company, LLC ("ISCO") pursuant to Massachusetts General Laws Chapter 30B and the City of Boston Charter for delivery of approximately 75,000 tons of sodium chloride rock salt ("rock salt") at $36.42 per ton ("the Contract") from October 30, 2004 to June 30, 2005. All relevant facts are set forth in the *Joint Stipulation of Facts* filed by the parties in advance of trial.

In short, ISCO entered into a written contract to provide rock salt to the City of Boston for a fixed period at a fixed price. By mid-February of 2005, the City determined rock salt in excess of its 75,000-ton estimate would be required to adequately address winter conditions,

1

and communicated this information to ISCO. Citing an increase in ocean freight costs, ISCO informed the City that it would only provide salt in excess of 75,000 tons at an increased price per ton.  The City refused, citing the limitations on its purchasing authority pursuant to Mass. Gen. L. c. 30B, and demanded that ISCO honor its contractual obligation to provide rock salt at a fixed price through June 2005.

ISCO contends that it fulfilled its contractual obligation upon delivery of the 75,000th ton of rock salt, and that it is entitled to the fair market value of all rock salt delivered in excess of 75,000 tons. The City maintains that, according to the terms of the contract, it had bargained for the right to purchase rock salt in excess of 75,000 tons at the contractual rate, that it was prohibited by Mass. Gen. L. c. 30B from paying a higher rate as demanded by ISCO, and that ISCO was obligated to provide rock salt at a fixed price of $36.42 per ton for the fixed term of the contract.  Further, the City has paid $36.42 per ton for every ton delivered in excess of 75,000 and  maintains it ahs no further contractual obligations.

**II.   Argument**

    **a. The contract language is unambiguous and should be construed according to its plain meaning,**

> **thus, the price per ton cannot be limited to the estimated number of tons of rock salt.**

This matter arises out of a contract entered into by the parties pursuant to Mass. Gen. L. c. 30B.  According to terms of the contract, ISCO was obligated to provide approximately 75,000 tons of rock salt to the City at a fixed price of $36.42 per ton.  That the 75,000 ton figure referenced in the written contract was an estimate, that the term of the contract was from October 1, 2004 through June 30, 2005, and that ISCO was obligated to provide rock salt to the City until June 30, 2005 at the contractual price was made clear by the face of the contract, which unambiguously stated: "PRICE WILL BE HELD FOR THE TERM OF THE CONTRACT AND SHALL NOT BE LIMITED TO THE ESTIMATED NUMBER OF ITEMS."

Under the rule that judicial construction is necessary or permissible only when the language of the contract is ambiguous, ambiguity exists where the terms of the contract are inconsistent on their face, or are reasonably susceptible to more than one interpretation, or where the phraseology can support *plausible* differences of opinion as to the meaning of the words employed and the obligations undertaken.  <u>Dasey v. Anderson</u>, 304 F.3d 148 (1st Cir. 2002); <u>see</u> <u>Lanier Professional Services, Inc. v. Rizzi</u>, 192

F.3d 1, 4 (1st Cir. 1999).  To determine contract ambiguity, a court must look to the entirety of the contract.  <u>Video Central, Inc. v. Data Translation Inc. Translation, Inc.</u>, 925 F.Supp. 867, 872 (D.Mass., 1996).

Where a contract is plain and unambiguous, it does not become ambiguous by reason of the fact the parties disagree as to the meaning of a disputed contractual provision, as any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of its terms.  In the absence of fraud, a person who signs a written agreement is bound by its terms regardless of whether that person reads and understands those terms.  <u>Tiffany v. Sturbridge Camping Club, Inc</u>., 32 Mass.App.Ct. 173, 587 N.E.2d 238 (Mass.App., 1992).

ISCO would have the Court disregard this precise and critical term of the contract, characterizing it as a "single sentence" of little import.  This representation is would subvert the City's intent to enter into a flexible contract that could adequately meet the City's needs throughout the winter season and ensure a fair price for its taxpaying constituents.

The provision that ISCO claims to be ambiguous is located within "Item 1 – Sodium Chloride Bulk" on the bid

4

documents, directly below language requesting information about the location of a bidder's stockpile and above a list of delivery locations for the City's Public Works Department.  This centrally located provision, "PRICE WILL BE HELD FOR THE TERM OF THE CONTRACT AND SHALL NOT BE LIMITED TO THE ESTIMATED NUMBER OF ITEMS," is clearly written and unmistakable.

Further, the fact that the City drafted the disputed provision of the contract is not dispositive of this case. Specifically, the Invitation for Bids contains the following provision entitled "SPECIFICATIONS":

> "4.1.  Before submitting any bids, bidders shall fully inform themselves in regard to all conditions pertaining to the Invitation For Bids and all required terms and conditions for carrying out the contract.  By filing a bid the bidders do thereby represent that they have so informed themselves.  Any estimates, plans or other information relating to the goods, services, labor or materials or work required by the contract documents are to be considered for the purposes of comparing several bids.  Neither the City/County, nor its officers, agents or employees, shall be responsible for the accuracy of, or bound by, such estimates, plans or information."

In the context of the bidding process, the industry standards and the express provisions of the Invitation for Bids, it is clear that the City intended the 75,000-ton figure to be an estimate for the purpose of comparing

5

various bids, and that ISCO bore the burden of remaining fully informed as to that critical fact.

To set aside the fixed price provision, ISCO would have the Court determine that an ambiguity exists in this provision of the contract. However, the plain meaning of the fixed price and term provision cannot be obscured: the unit price indicated in the contract "SHALL NOT BE LIMITED TO THE ESTIMATED NUMBER OF UNITS." Had the City not intended to include in its bargain with ISCO the flexibility necessary to accommodate unpredictable winter weather – by contracting for a *price per ton* that would be held until June 30, 2005 – it would not have included this provision, nor would it have indicated that in its Invitation for Bids that such figures were estimates.

Because the contract itself is clear and complete, other evidence, such as prior or contemporaneous oral discussions or negotiations, is not relevant. In interpreting the provisions of a contract, the Court must construe and enforce unambiguous terms of the contract according to their plain meaning. Parol evidence, that is, verbal or written evidence not contained in the contract itself, is not admissible to supplement, contradict or vary the terms of the agreement where the terms of the contract are unambiguous. Mass. Mun. Wholesale Elec. Col. v. Town

6

of Danvers, 411 Mass. 39, 48, 577 N.E.2d 283, 289 (1991); Chase Commercial Corp. v. Owen, 32 Mass.App.Ct. 248, 588 N.E.2d 705 (1992).

### B. International Salt Will Not Be Able to Prove the Existence of a Separate Contract to Supply the City With Salt at an Unnamed Price In Late-February and March 2005.

Even if this Court determines that the contract entered into by the City and International Salt did not require International Salt to provide more than 75,000 tons of salt, the City is not liable. The Plaintiff alleges that it sold rock salt in amounts exceeding 75,000 tons to the City under a separate and new contract "implicitly" entered into.

#### 1. The City Never Agreed To Purchase Salt on Any Terms Other Than for $36.42 Per Ton.

International salt cannot prove that the City entered into the alleged "new" contract for salt in excess of 75,000 tons. Although International Salt is correct that under the UCC contracts can be enforced even where all material terms are not specified, there still must be an agreement by the parties or at least an agreement to come to terms on material terms of the contract. In this case there is no such agreement. No official from the City of Boston ever agreed to pay more than the original per ton contract price. In fact, the City was consistent and

7

explicit in phone calls, letters, and purchase orders that it would only pay $36.42 per ton.  Therefore, International Salt will not be able to prove that the City entered into an agreement to purchase salt at some other price to be determined later.

### 2. The City of Boston Did Not Enter Into An Emergency Contract With International Salt Pursuant to the Provisions of G.L. c. 30B, § 8.

The City of Boston, pursuant to G. L. c. 30B and other state statues that constitute the City Charter must follow a variety of rules with respect to entering into enforceable contracts.  For example, it must publicly advertise and accept bids for all new purchases, and as described in more detail below, contracts with the City are only enforceable if made in writing, signed by the mayor, and certified by the city auditor. International Salt seeks to avoid application these municipal bidding and contracting requirements by claiming that the City entered into the alleged new contract pursuant to the emergency procurement provisions of G. L. c. 30B, § 8.  This argument fails on both factual and legal grounds.

First, this case does not involve a situation where complying with the provisions of G. L. c. 30B "would endanger the health or safety of the people or their property." § 8.  Not only did the City in fact have

sufficient overall quantities of salt to get through the winter, had all future deliveries been cut off the City could have modified its salt use to stretch its supply without endangering public safety.

Second, G. L. c. 30B, § 8, provides a mechanism through which "a procurement officer <u>may</u> make" an emergency procurement that does not comply with some provisions of chapter thirty-B. It is only operative when a procurement officer determines it should be utilized, but William Hannon, the City's Chief Purchasing Officer did <u>not</u> utilize it in this case. Had he done so, the statute also requires that he "make a record of each emergency as soon after the procurement as practicable, specifying each contractor's name, the amount and the type of each contract, a listing of the supply or service provided under each contract, and the basis for determining the need for an emergency procurement," which he must submit to the Massachusetts Secretary of State. Mr. Hannon clearly did not utilize the provision in this case.

Third, G.L. c. 30B, § 8, is a limited statutory tool legally insufficient empower a government official to enter into the new contract International Salt alleges in this case. A G.L. c. 30B, § 8 "emergency procurement shall be limited to only supplies or services necessary to meet the

9

emergency and shall conform to the requirements of this chapter to the extent practicable under the circumstances." The greater than 27,000 tons of salt provided under the alleged new contract cannot be found to be the limited amount of supplies permissible under the statute to meet an emergency. As indicated in the stipulated facts, had the City not purchased additional rock salt at that point, it would have had rock salt remaining in its reserves at the end of the season. Chapter 30B, § 17, also requires that contracts must be in writing to be enforced against a municipality. It is impossible in the circumstances of this case, where the alleged new contract was based on letters and phone calls that took place over a period from February 7, 2005 through February 18, 2005, to determine that it was not practicable to comply with the writing requirement of G. L. c. 30B.

> 3. **Regardless of the Question of "Emergency" No Contract is Enforceable Against the City Unless it is In Writing, Bears the Mayor's Written Approval, and Bears Certification By the City Auditor.**

Contracts with the City must be in writing, and bear written approval of the mayor and city auditor in order to be enforced. G. L. c. 30B, § 17 (a) states that "[a]ll contracts in the amount of five thousand dollars or more shall be in writing, and the governmental body shall make

10

no payment for a supply or service rendered prior to the execution of such contract." The city Charter specifies that "[a]ll contracts made by any department of the City of Boston . . . shall, when the amount involved is $10,000 or more, . . . be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefore or has cited thereon the statute under authority of which the contract is being executed without an appropriation." St. 1890, c. 418, § 6, as amended by St. 1998, c. 262, § 1.

Massachusetts courts – and federal courts applying Massachusetts law - "have consistently and punctiliously held that one dealing with a city or town cannot recover if statutory requirements such as are contained in the [city's] charter have not been observed." United States Leasing v. City of Chicopee, 402 Mass. 228, 231 (1988) (citations omitted). See also KVS Information Systems, Inc. v. Tisbury, 753 F.Supp 1020, 1022 (D.Mass. 1990). The requirement that the mayor approve the contract in writing in order for it to be enforceable "is not something which can be sloughed off as a mere ministerial act." Lumarose Equipment Corp. v. City of Springfield, 15 Mass. App. Ct.

11

517, 519-520 (1983). A party dealing with a public employee must, "at its peril" ascertain the extent of statutory authority possessed by the employee. Potter & McArthur, Inc. v. City of Boston, 15 Mass. App. Ct. 454, 459 (1983), citing Wormstead v. Lynn, 184 Mass. 425, 428 (1903). A plaintiff cannot recover when those statutory requirements are not satisfied. Adalian Bros. v. City of Boston, 323 Mass. 629, 632 (1949).

While the City may enter into certain emergency contracts without following ordinary public bidding procedures under Chapter 30B, St. 1890, c. 418, § 6, as amended by St. 1939, c. 156 § 2 & St. 1998, c. 262, § 1, still requires that a contract be in writing, approved in writing by the mayor, and certified by the city auditor in order to be enforceable against the City of Boston. See Massachusetts General Hospital v. City of Revere, 385 Mass. 772, 775-776 (1982) (reversed on other grounds, listing mayoral signature requirement as essential even in case it recognized as potential emergency). Although City officials may enter into contracts that exceed appropriations "in case[s] of extreme emergency involving the health and safety of the people or their property," Ma. St. 1909, c. 486, § 16, as amended by St. 1982, c. 190, § 17, the possibility of such contracts with respect to appropriations does not alter

in any way the requirements of separate city charter provisions requiring writing, mayoral approval, and auditor certification.  The statute imposing those requirements applies to "all" contracts made by any department, a term that includes emergency contracts – especially in light of the fact that the term "all" remains in the statute after its amendment in 1998.  Moreover, the language of St. 1890, c. 418, § 6, as amended by St. 1998, c. 262, § 1, is tailored to apply even when officials invoke emergency to exceed appropriations because it allows the city auditor to certify that instead of an available appropriation, there is statutory authority to exceed appropriations.  (The City Auditor is required to either "certify thereon that an appropriation is available therefore or [cite] thereon the statute under authority of which the contract is being executed without an appropriation.")

13

```
                                    Respectfully submitted,
                                    DEFENDANT, CITY OF BOSTON
                                    William F. Sinnott
                                    Corporation Counsel
                                    By its attorney:


Date: January 4, 2007               ___/s/ Adam N. Cederbaum_____
                                    Scott C. Holmes, BBO #544545
                                    Adam N. Cederbaum, BBO #661549
                                    Assistant Corporation Counsel
                                    City of Boston Law Department
                                    Room 615, City Hall
                                    Boston, MA 02201
                                    (617) 635-4042 (SH)
                                    (617) 635-4030 (AC)
```