UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 05-cv-10921-RGS

INTERNATIONAL SALT
COMPANY, LLC
  Plaintiff,

v.

CITY OF BOSTON
  Defendant.

## DEFENDANT CITY OF BOSTON'S POST-TRIAL MEMORANDUM IN SUPPORT OF ITS REQUESTS FOR FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.    Introduction.

The Defendant City of Boston ("City") submits this Memorandum in Support of

its Requests for Findings of Fact and Rulings of Law. Based on the Stipulated Facts

entered by both parties and the evidence presented at trial, the Plaintiff International Salt

Co., LLC, ("International Salt") failed to prove that it is entitled to relief on any count.

This memorandum demonstrates the following:

- The alleged contract is unenforceable because it violates G. L. c. 30B (pp. 5-12).

- It is unenforceable because it is not in writing or signed by the mayor (pp. 13-15).

- Liability cannot be imposed under any alternative equitable theory (pp. 15-20).

- The written contract and mayoral signature law applies regardless of "emergency" (pp. 20-28).

- The City never agreed to buy salt for more than $36.42 per ton (pp. 28-30).

- Fair market value did not exceed $42 (pp. 30-34).

1

This case stems from a contract between the City and International Salt for rock salt used to treat streets during snowstorms in 2004-2005. (Stip. Fact #1.) The City believed at all times that the contract called for an estimated amount of 75,000 tons of salt for the season, and that it was entitled to purchase additional salt for $36.42 per ton. In the middle of the winter, once the City had received almost 75,000 tons, International Salt expressed disagreement with the City's understanding. It maintained that it was only required to deliver up to 75,000 tons at the stated price, and that any salt it supplied in excess of 75,000 tons was supplied pursuant to some new agreement by which it should receive more than $36.42 per ton. Proceeding under its understanding that it was contractually entitled to more salt, the City ordered additional salt, explicitly referring to the original contract and stated a purchase price of $36.42 per ton. (Stip. Facts #28, 31, 32.) International Salt delivered additional salt and invoiced the City at $36.42 per ton (which the City paid) but also sent a letter to the City indicating that it was reserving its right to seek a higher price for the additional salt from a court. (Stip. Facts #30.)

The City believed at all times that the contract entitled it to additional salt, and it ordered and paid for additional salt accordingly. On the first day of trial of this matter, however, the Court (Stearns, J.) ruled that the contract did not entitle the City to more than 75,000 tons at the stated contract price of $36.42 per ton. The effect of that ruling is that, contrary to what the City had believed, the parties' contractual relationship setting a price of $36.42 per ton ended when International Salt supplied 75,000 tons.

The Court's ruling also means that the Plaintiff, International Salt, bears the burden of proving a new and enforceable agreement against the City entitling it to more than $36.42 per ton. The alleged new contract that it seeks to enforce is one that is

2

entirely inconsistent with principles of public contacting, such as competition, making
agreements publicly, and documenting agreements. International Salt, whose business is
providing salt to government buyers, is intimately familiar with those principles.
International Salt failed to prove that such a contract did, or legally could, exist with the
City.

The alleged contract cannot be enforced because G. L. c. 30B prevents any city
from entering or honoring a contract that is made privately, non-competitively, and
without documentation (pp. 5-12). Although the City's procurement officer may make
limited purchases without following some public bidding rules when following those
particular rules would threaten the health or safety of the people, International Salt did
not prove an emergency that created authority to enter into a private, uncompetitive,
unwritten, open-priced, contract for over 27,000 tons of salt.

The alleged contract is also unenforceable under Massachusetts law because no
contract is enforceable against the City unless it is in writing and signed by the mayor
(pp. 13-15).

The statutory requirements for recovery from a municipality cannot be evaded
through application of equitable doctrines (pp. 15-20) – whether phrased as estoppel or
unjust enrichment/quantum meruit as in Count II of the Plaintiff's Complaint. Failure to
apply the statutory requirements for equitable reasons would undo the rules and
protections created by the statutes, and the Massachusetts Supreme Judicial Court has
repeatedly clarified that there are no equitable grounds for recovery against a
municipality when statutory contract requirements are not complied with. Nor would
equitable relief be appropriate in this case because City employees repeatedly informed

3

International Salt that it could not pay a higher price, and International Salt is well aware that municipal officials cannot legally enter into the type of contract it alleges.

There is no emergency exception to the written contract and mayoral signature law, as its language, legislative history, and case law demonstrate (pp. 20-28). Nor would an emergency exception make any sense here – the alleged contract in this case was one that could easily have been put in writing and approved by the mayor in plenty of time to the hypothetical risk of running low on salt weeks later.

Even if municipal contracting statutes did not clearly bar recovery in this case, International Salt failed to prove that there was a new agreement to buy salt at a price over $36.42 per ton (pp. 28-30). It did not prove that the City accepted an offer to purchase salt at a higher but unspecified price. Instead, the City explicitly refused a higher price, and offered to purchase more salt at a stated price of $36.42 per ton, which International Salt accepted by delivering more salt in response to that explicit order. Under the Uniform Commercial Code, a merchant like International Salt is not free to accept an offer to purchase but then unilaterally change a material term without explicit consent. International Salt's attempts to have it both ways were ineffective attempts to alter the terms of the City's offer, and were not accepted.

International Salt did not prove that the fair market value of the City's purchase exceeded $42 (pp. 30-34). Although the City never agreed to a price higher than $36.42, International Salt now seeks to have the court declare that the City implicitly agreed to pay approximately $56 per ton. It did not prove that to be fair market value. Evidence at trial demonstrated that it was willing to sell salt to the City for less than $42.36 per ton. International Salt relies almost exclusively on testimony regarding the cost of sending a

4

"spot" ship to Boston, even though that testimony was entirely unsupported by documentation, did not establish that the "spot" ship was used before costs fell in the spring of 2005, and was inconsistent with International Salt's own testimony that "spot" ships are always required to meet contract requirements during snowy winters such as 2004-2005.

## II.    The Plaintiff Failed to Prove That the City Had Authority To Enter Into the Alleged Contract Pursuant to the Emergency Provision of G. L. c. 30B.

As even the Plaintiff acknowledges, City officials do not have the legal authority to procure goods without following the procedures laid out by G. L. c. 30B, and a purported contract with a municipality is only valid if made by an official acting with legal authority to do so. G. L. c. 30B, § 17; Haffner v. Director of Public Safety of Lawrence, 329 Mass. 709, 712 (1953). It is the plaintiff's burden to prove that all statutory requirements were complied with. Dos Santos v. City of Peabody, 327 Mass. 519, 520–21 (1951).

Chapter thirty-B of the Massachusetts General Laws imposes public-bidding and contract formation procedures that municipalities must follow to enter an enforceable contract. Ordinarily, a city must advertise all contemplated purchases for two weeks, accept bids from all interested suppliers, award contracts to the low bidder, and document all contracts in writing. G. L. c. 30B, §§ 1, 2, 5, 17. "[A] contract made in violation of [chapter thirty-B] shall not be valid, and the governmental body shall make no payment under such contract." Id., § 17. International Salt claims that none of these public bidding requirements apply in this case because the City entered into the alleged new contract pursuant to the emergency procurement provisions of G. L. c. 30B, § 8.

5

Section eight is effective when "the time required to comply with a requirement

of this chapter would endanger the health or safety of the people or their property," and it

only allows the formation of a contract "without following that requirement." Id.

(emphasis added). It does not render the rest of chapter thirty-B ineffective. A contract

made pursuant to section eight must be limited to those supplies necessary to meet the

emergency, it must comply with all other public bidding requirements to the extent

practicable, and it must still be for a set price.[1]

In order for the Court to impose liability on the City under this theory, then, it

must find that International Salt proved all of the following:

- That the time required to publicly advertise a purchase of additional salt would
  have "endanger[ed] the health and safety of the people or their property;"

- That the time required to follow a modified process that still incorporated some
  form of competitive bids would have "endanger[ed] the health and safety of the
  people or their property;"

- That the time required to execute a written contract would have "endanger[ed] the
  health and safety of the people or their property;"

---

[1] G. L. c. 30B, § 8, provides:

> "Whenever the time required to comply with a requirement of this chapter would
> endanger the health or safety of the people or their property a procurement officer
> may make an emergency procurement without following that requirement. An
> emergency procurement shall be limited to only supplies or services necessary to
> meet the emergency and shall conform to the requirements of this chapter to the
> extent practicable under the circumstances. The procurement officer shall make a
> record of each emergency as soon after the procurement as practicable, specifying
> each contractor's name, the amount and the type of each contract, a listing of the
> supply or service provided under each contract, and the basis for determining the
> need for an emergency procurement.
>
> The procurement officer shall submit a copy of this record at the earliest possible
> time to the state secretary for placement in any publication established by the state
> secretary for the advertisement of procurements." G. L. c. 30B, § 8.

6

- That it was not "practicable under the circumstances" for the City to comply with any provisions of G. L. c. 30B;

- That 27,000 tons of additional salt was the minimum amount necessary to meet any "emergency" proved by International Salt; and

- That the City's procurement officer, William Hannon, in fact exercised his discretion to utilize G. L. c. 30B, § 8.

International Salt failed to prove each and every one of those things, and therefore failed to prove that the City's purchasing agent had authority to enter into the alleged new contract.

*A.*    *International Salt Did Not Prove That the Time Required to Fully Comply With G. L. c. 30B Would Endanger the Safety of the People.*

International Salt did not prove that the City ever faced any sort of emergency, much less that complying with any provisions of G. L. c. 30B "would endanger the health or safety of the people or their property." Id., § 8. The "emergency" that International Salt sought to prove at trial was a purely speculative one. If it had not delivered additional salt, it suggests, the City's salt inventories would have become insufficient to protect the City in the event of additional snowstorms. It supported this proposition with three main pieces of evidence. First, the parties agree that during snow and ice storms road salt is critical to maintaining safe roads. (Stip. Fact #12.) Second, International Salt had public works Superintendant Canavan calculate that the City would only have had 2,000 tons of salt left on March 23, 2005, if the City had not received any additional salt, and if the City had nonetheless used the same amount of salt as it actually did after February 10, 2005. The obvious import of this testimony is that if the City only had 2,000 tons of salt available on March 23, 2005, the roads could have become treacherous in the event of an additional storm or storms. Finally, Superintendent Canavan also

7

testified that the City tries to keep its salt yards full, near an inventory of 30,000 tons,

during the winter, and that if the inventory fell below 15,000 tons during the winter he

would be very uncomfortable and would require more salt. The import of that testimony

is that the City needs a certain inventory of salt to insure their ability to respond to winter

storms. Superintendant Canavan also testified, however, that in mid-to-late March

inventories can fall below 15,000 tons without posing a threat to safety. That testimony

is supported by the fact that the City's salt inventory was allowed to fall to approximately

12,900 tons of salt at the end of the 2003-2004 winter season. See Exh. 11.[2]

    This evidence fails to demonstrate an emergency. International Salt relies on

assumptions that: (1) the City would not have been able to procure any additional salt,

and (2) the City would have used salt in the exact same manner after February 10, 2005

regardless of whether it had a source to resupply its salt yards or not. Even under that

unrealistic scenario there would not have been any emergency because the City would, in

fact, have had enough salt to meet public safety needs throughout the entire winter. More

importantly, the Plaintiff's assumptions were shown to be unrealistic and untrue, because

the City would have taken measures to reduce salt use if it was not able to order

additional salt after February 10, 2005.

    Superintendent Canavan testified that when the City is concerned about salt

supplies it can spread a mixture of less salt and more sand during snowstorms. He

testified that during the period between February 10, 2005 and March 23, 2005, the City

---

[2] Exhibit 11, which is a spreadsheet prepared by Mr. Edmands, counsel to International
Salt, lists the City's beginning inventory as of 09/18/2004 as 12,900 tons. The
spreadsheet includes this figure as the initial delivery, but that is due to the need to make
all figures fit into categories of "Delivered" or "Used." The 12,900 tons were actually
what remained from the end of the previous winter, and International Salt did not deliver
any salt before its contract began on October 1, 2004.

8

in fact either spread salt alone or in a one-to-one mixture with sand. He also testified that

the City can safely spread a mixture of up to one-part-salt to three-parts-sand, and that it

would have taken such steps to conserve salt if it had not been able to procure additional

salt after February 10, 2005. Superintendant Canavan conceded that the City prefers to

limit the amount of sand that it spreads because it imposes higher cleanup costs than

spreading salt does.

International Salt, then, has not proved that the City did, or would have, faced an

emergency situation in 2005. Since the City could have conserved salt, its inventories

would not have been depleted as quickly. Take a conservative example: if the City

switched from using a 1:1 salt to sand mixture (it actually used more salt than that since it

did not always add sand) to a 1:2 mixture (still less sand than possible) it would use two-

thirds as much salt. At that rate, even if the City received no more salt, it would have had

approximately 11,324 tons of salt remaining on March 23, 2005, and inventories would

not have fallen below 15,000 tons until March 12, 2005.[3]  Those inventories would not

---

[3] By February 4, 2005, International Salt delivered 70,848 tons, (Stip. Fact #15.) and the
City's inventory was 27,696 tons. See Ex. 11. Adding the 4,152 tons remaining on the
contract to get an inventory 31,848 tons, then using salt use figures from Exhibit 11, one
can calculate the hypothetical inventory available if the City received no shipments but
used salt in the same manner, and the hypothetical inventory if it received no more salt
but cut salt use to two-thirds.

| Date | Actual Amount Used | Hypothetical Inventory Based on Actual Use | Two-Thirds of Amount Used | Hypothetical Inventory Based on Two-Thirds Use |
|---|---|---|---|---|
| February 9, 2005 | 0 | 31848 | 0 | 31848 |
| February 10, 2005 | 3291 | 28557 | 2172 | 29676 |
| February 21, 2005 | 3678 | 24879 | 2427 | 27248 |
| February 22, 2005 | 1863 | 23016 | 1230 | 26019 |
| February 23, 2005 | 1008 | 22008 | 665 | 25354 |
| February 24, 2005 | 4684 | 17324 | 3091 | 22262 |
| February 28, 2005 | 5044 | 12280 | 3329 | 18933 |
| March 8, 2005 | 5976 | 6304 | 3944 | 14989 |
| March 12, 2005 | 3633 | 2671 | 2398 | 12591 |
| March 23, 2005 | 1920 | 751 | 1267 | 11324 |

9

have represented "emergency" situations. Although the City prefers to have full salt
yards in winter and getting below 15,000 tons in the winter would present an urgent
situation, Superintendant Canavan's testimony (supported by evidence from the prior
winter), was that having less than 15,000 tons in mid-to-late March is not an emergency.
International Salt offered no contradictory evidence.

Because it did not prove its assumptions of what would lead to a hypothetical
emergency, International Salt failed to prove that the time required to fully comply with
chapter thirty-B would have endangered health and safety. It elicited testimony at trial
that it would have taken the City four to six weeks to purchase salt if it complied with all
provisions of chapter thirty-B, including the advertising and sealed bid procedures.
International Salt did not prove that a four to six week period for acquiring more salt after
February 10, 2005, which would bring the City to March 7, 2005 – March 21, 2005,
would have endangered health and safety. Instead, the City actually had sufficient
quantities of salt to get to March 7th through 21st, and it could have safely had even more
if it perceived a need to modify its salt use to stretch its supply during that four to six
week period.

B.  *International Salt Did Not Prove That Complying With Terms Other Than
    the Two-Week Advertising Requirement Would Endanger Health or
    Safety, And Did Not Prove That The Alleged Contract Complied With
    Chapter Thirty-B To the Extent Practicable Under the Circumstances.*

Even if this Court finds that a four-to-six week waiting period to get salt might
have threatened health and safety, that would at most justify noncompliance with the two-
week advertising period required by G. L. c. 30B, § 5. Under G. L. c. 30B, § 8, the City
would still have to follow the rest of the statute to the extent practicable. If the

10

advertising period is too long, the statute allows non-compliance with that requirement. However, it must still engage in some form of competition if it can, and solicit quotes from multiple suppliers. Commonwealth of Massachusetts Office of the Inspector General, Municipal, County, District, and Local Authority Procurement of Supplies Services and Real Property, p. 68 (2006) (at www.mass.gov/ig/publ/30bmanl.pdf). Not complying with the advertising period would shorten the procurement time by two weeks, plus the time of preparing and placing public advertisements. International Salt did not prove that a period of well under two-to-four weeks to procure more salt would threaten public safety.

Likewise, it did not prove that getting a contract in writing would take so much time that it would threaten safety or be impracticable. Chapter 30B, § 17(a), imposes a very strict rule that: "all contracts in the amount of five thousand dollars or more shall be in writing, and the governmental body shall make no payment for a supply or service rendered prior to the execution of such contract." It is impossible in the circumstances of this case, where the alleged new contract was based on letters and phone calls that took place over a period from February 7, 2005 through February 18, 2005, to determine that it was not practicable to comply with the writing requirement of G. L. c. 30B.

C.      *International Salt Did Not Prove That the Alleged Contract Was Limited To Supplies Necessary to Meet The Alleged Emergency.*

Under G. L. c. 30B, § 8, an "emergency procurement shall be limited to only supplies or services necessary to meet the emergency." International Salt did not even attempt to prove that the greater than 27,000 tons of salt provided under the alleged new contract was the limited amount needed to respond to the emergency it sought to prove.

11

### D.    *International Salt Did Not Prove That the City's Procurement Officer Entered Into The Alleged Contract Pursuant to Section Eight.*

Section eight is not a legal tool that can be used by plaintiffs or the courts after the

fact to impose liability on municipalities for non-competitive contracts. It is a

mechanism through which "a procurement officer may make" an emergency

procurement. Id. (emphasis added). It only operates when a "procurement officer"

determines it should be utilized, and no other person or entity has the power to utilize it.

It also requires that a procurement officer exercising such authority "make a record of

each emergency as soon after the procurement as practicable, specifying each contractor's

name, the amount and the type of each contract, a listing of the supply or service

provided under each contract, and the basis for determining the need for an emergency

procurement," and submit that record to the Secretary of the Commonwealth. Id.

(emphasis added.)

International Salt failed to prove that William Hannon, the City's procurement

officer, used section eight in this case. Mr. Hannon's uncontroverted testimony at trial

was that he did not seek to enter into a noncompetitive contract pursuant to section eight.

Instead, he sought to enforce a written, competitive contract which he believed to be valid

and binding at the time. He did not make a determination (written or otherwise) that

there was an emergency basis for a section eight procurement, and that no such record

was transmitted to the Secretary of the Commonwealth. Instead, Mr. Hannon repeatedly

informed International Salt that chapter thirty-B prevented the City from entering a new

agreement to buy salt for more than \$36.42 per ton. (Stipulated Facts #21, 23, 34.) Mr.

Hannon clearly did not utilize the provision in this case.

12

## III.   International Salt Cannot Recover From the City Because It Did Not Have a Written Contract Signed By the Mayor.

The Court cannot impose liability on the City because International Salt did not

prove that the alleged contract was made in writing or was approved in writing by the

mayor, both of which are absolute prerequisites to recovery. By statute enacted by the

Massachusetts Legislature forming part of Boston's City Charter:[4]

"All contracts made by any department of the City of Boston . . . shall, when the amount involved is $10,000 or more, . . . be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefore or has cited thereon the statute under authority of which the contract is being executed without an appropriation."

St. 1890, c. 418, § 6, as amended by St. 1998, c. 262, § 1.

This statutory requirement has an analogous counterpart in G. L. c. 43, § 29,

which comprises a nearly identical charter provision for other Massachusetts cities. It too

provides that "[a]ll contracts made by any department . . . where the amount involved is

five thousand dollars or more shall be in writing, and no such contract shall be deemed to

have been made or executed until the approval of the mayor . . . is affixed thereto." G. L.

c. 43, § 29. It does not contain an auditor's certification requirement like the City's

statute, and it adds an additional requirement that "the head of the department . . . making

the contract" affix her approval in writing. Id. The two statutes are interpreted

interchangeably by Massachusetts courts, and precedent established for one is binding on

application of the other. See, e.g., Adalian Bros. v. City of Boston, 323 Mass. 629, 631-

---

[4] The "City Charter" is a body of state laws dictating the structure, powers, and operation of the City. Boston, like all cities and towns, is a political subdivision of the Commonwealth, and state law creates its sole powers to act for and bind the people. Many laws comprising Boston's City Charter were enacted specifically for the City and are therefore included only in the Massachusetts Acts and Resolves for each year and not codified in the General Laws.

13

632 (1949) (citing cases involving G. L. c. 43, § 29 in rejecting contract claim against

Boston where there was no writing or mayoral signature); Urban Transport, Inc. v. Mayor

of Boston, 373 Mass. 693 (1977) (same); Park Drive Towing, Inc. v. City of Revere, 442

Mass. 80 (2004) (citing cases involving Boston statute in rejecting contract claim where

there was no writing or mayoral approval); U. S. Leasing Corp. v. City of Chicopee, 402

Mass. 228, 229, 230 n.3 (1988) (same). See also Ungerer v. Smith, 765 F.2d 264, 264

(1st Cir. 1985) (citing to cases involving Boston statute for application of G. L. c. 43, §

29).

The statutory writing and mayoral signature requirements form an entirely

separate bar to recovery than chapter thirty-B does. Massachusetts courts "have

consistently and punctiliously held that one dealing with a city or town cannot recover if

statutory requirements such as are contained in the [city's] charter have not been

observed." U. S. Leasing Corp. v. City of Chicopee, supra at 231 (citations omitted).

The requirement that the mayor approve the contract in writing "is not something which

can be sloughed off as a mere ministerial act." Lumarose Equipment Corp. v. City of

Springfield, 15 Mass. App. Ct. 517, 519-520 (1983). A party dealing with a public

employee must, "at its peril" ascertain the extent of statutory authority possessed by the

employee. Potter & McArthur, Inc. v. City of Boston, 15 Mass. App. Ct. 454, 459

(1983), citing Wormstead v. Lynn, 184 Mass. 425, 428 (1903). A plaintiff cannot

recover when those statutory requirements are not satisfied. Adalian Bros. v. City of

Boston, 323 Mass. 629, 632 (1949). See, e.g. Potter & McArthur, supra (rejecting

contract claim because alleged contract amendment was not signed by mayor); United

States Leasing, supra (rejecting contract claim because alleged contract extension signed

14

only by purchasing agent, not mayor). See also, B & R Realty Co. v. Springfield

Redevelopment Authority, 708 F.Supp. 450, 455 (1989).   International Salt's claims

must be dismissed for its failure to prove compliance with the statute.

## IV.     The Court Cannot Avoid Application of Municipal Contracting Requirements By Imposing Liability on Equitable Grounds Such as Estoppel, Quantum Meruit, or Unjust Enrichment.

International Salt pleaded a count for quantum meruit / unjust enrichment against

the City, and also suggested at trial that it might recover on an estoppel theory. Although

this Court need only consider the counts pleaded by the Plaintiff, Massachusetts case law

precludes any recovery on equitable grounds when the statutory requirements for valid

municipal contracts are not met.  The entire body of case law refusing to enforce

purported contracts that failed to comply with the writing and signature requirements of

Ma. St. 1890, c. 418, § 6, as amended, and  G. L. c. 43, § 29, stands for the proposition

that these contracting statutes cannot be avoided by imposing liability on any other

equitable theory. The Massachusetts Supreme Judicial Court put it succinctly:

"a party cannot evade the statutory limitations on a municipality's contracting power by rendering services and subsequently seeking recovery based on alternative theories. See United States Leasing Corp. v. Chicopee, 402 Mass. 228, 231-232, 521 N.E.2d 741 (1988), and cases cited (estoppel); Adalian Bros. v. Boston, 323 Mass. 629, 632, 84 N.E.2d 35 (1949) (implied contract); Lowell v. Massachusetts Bonding & Ins. Co., 313 Mass. 257, 272, 47 N.E.2d 265 (1943) (quantum meruit)." Park Drive Towing v. City of Revere, 442 Mass. 80, 84, n.7 (2004)

The Supreme Judicial court has repeatedly explained that courts cannot allow

recovery on any other ground when statutory contract requirements are not met. To do so

would simply "circumvent" the statutes, U.S. Leasing, supra, and allow them to be

"evaded" by the very contractors and public officials whose actions they control, Adalian

Bros., supra. In Kimball v. City of Medford, the court denied liability against a city for

15

work performed to repair a school building. 340 Mass. 727 (1960). Even though the

plaintiff performed the work pursuant to a vote of the school committee and written

authorization of the superintendant, there was no contract approved in writing by the

mayor. Id. at 727-728. Liability, as always, was precluded under "the familiar law that

one dealing with a city or town cannot recover if statutory requirements . . . have not been

observed, and the burden of proving compliance with such requirements rests on the

plaintiff." Id. at 730, 729. The SJC explained why courts cannot allow recovery on any

alternative equitable grounds:

> "[t]his is a harsh result, as there is no suggestion that the plaintiffs did not fully
> and faithfully perform the services requested of them. But, as we said earlier, one
> who contracts with a municipality can recover only if the statutory safeguards
> governing its contracting powers are satisfied. Any other rule, however appealing
> it may be in an individual case, would in the long run render such safeguards
> worthless; it would be another instance of a hard case making bad law." Id. at
> 732.

    *A.    The Court Cannot Impose Liability Based on Estoppel.*

Applying the strict rule laid out by the Legislature and Supreme Judicial Court,

which might be harsh in some instances, it is clear that the Court cannot impose liability

in this case based on estoppel. In U. S. Leasing, supra, the Supreme Judicial Court

rejected estoppel as a viable ground for recovery when an alleged contract lacked written

mayoral approval. In stark contrast to the evidence presented by International Salt, the

plaintiff in that case had a written contract signed by the superintendant of schools and its

purchasing agent, a resolution of the school committee authorizing the contract, and

written certification from the city solicitor that the persons signing the contract had

authority to bind the city. Id. at 229, 231-232. Despite these explicit assurances, the

court "refused to estop [the city] from denying the existence of a contract where the

16

statutory requirements were lacking, for to do so would circumvent our insistence that those requirements be satisfied precisely. Id. at 232, citing Phipps Prods. Corp. v. Massachusetts Bay Transp. Auth., 387 Mass. 687, 693-694 (1982).

Likewise, in Potter & McArthur, Inc. v. City of Boston, 15 Mass. App. Ct. 454 (1983), a naval architect that performed design work for a fireboat at the behest of the fire commissioner was denied any relief because there was no written contract approved in writing by the mayor. "It may well be that [the architect] has been treated badly by representatives of the city," the court conceded, but the plaintiff "must 'at his peril ... ascertain the extent of the authority of the public officer with whom he deals,' [and the] public 'is not estopped by a violation of duty on the part of public officials." Id. at 459, citing Wormstead v. Lynn, 184 Mass. 425, 428 (1903) (estoppel "has no application where a person enters into a contract with a public officer who undertakes to act for and to bind a municipal corporation of other body politic. Such a person is bound, at his peril, to ascertain the extent of the authority of the public officer with whom he deals. In such a case the money pledged for the payment of the contractor is the money of the public . . . and the public is not estopped by a violation of duty on the part of public officials, no matter how many officials have been concerned in it, and no matter how long it may have continued.").

These clear, inflexible state laws which preclude recovery based on estoppel, of course, govern when a case is brought in the federal court. Although the court did not explicitly discuss estoppel in Ungerer v. Smith, 765 F.2d 264 (1st Cir. 1985), it rejected any notion of alternative relief in the face of a failure to comply with municipal contracting statutes. In that case, the mayor explicitly promised a developer that the city

17

would develop certain streets in order to get the developer to commit to a project. Since
the mayor did not have the statutory authority to make street repair contracts under the
city charter, the contract was not enforceable based on the mayor's representation and the
court denied any relief. B & R Realty Co. v. Springfield Redevelopment Authority, 708
F. Supp. 450 (D. Mass. 1989) also rejected municipal liability, because the promise a
plaintiff received from the mayor that the city would guarantee a contract was not written
or signed. The court denied any form of relief because under Massachusetts law those
who deal with municipal officers must "at their peril see to it that such officers and agents
are acting within their authority." Id. at 455, citing 56 Am.Jur. 2d Municipal Corporations
§ 504 (1971).

Moreover, even if it were not precluded as a matter of law, estoppel cannot be
used to impose liability in this case because International Salt has not met its heavy
burden of proving that the City promised to pay more than $36.42 per ton of salt and that
any reliance on such a promise was reasonable. "Circumstances that may give rise to an
estoppel are (1) a representation intended to induce reliance on the part of a person to
whom the representation is made; (2) an act or omission by that person in reasonable
reliance on the representation; and (3) detriment as a consequence of the act or
omission," but the party claiming estoppel "has a heavy burden to prove that all [three]
elements are present," especially when claiming estoppel against the government.
Sullivan v. Chief Justice for Admin. and Management of Trial Court, 448 Mass. 15, 27-
28 (2006). No City officer ever represented that the City would pay more than $36.42
per ton of salt. The statement upon which International Salt allegedly relied was that of
Commissioner Casazza to Mr. Jones, the CEO of International Salt, during a phone

18

conversation on February 10, 2005. All witnesses agree, however, that he never agreed

to a higher price. During the conversation, Mr. Casazza asked Mr. Jones to commit to

delivering additional salt, and Mr. Jones stated that in order to do so International Salt

needed a price increase. Mr. Casazza, Mr. Jones, and Mr. Thompson all testified that in

response Mr. Casazza simply stated that price was not his issue to deal with and that

International Salt would have to resolve the issue of price with other representatives from

the City. That is not a representation that the City would pay a higher price, so

International Salt failed to prove the first element of estoppel.

Even if International Salt subjectively understood Mr. Casazza's statement to be a

promise, any reliance on the statement cannot be found to be reasonable. See Turnpike

Motors, Inc. v. Newbury Group, Inc., 413 Mass. 119, 125 (1992). First, the statement

itself is not objectively a promise to pay a higher price. Second, the City's procurement

officer, William Hannon, who signed the original contract, explicitly told International

Salt before the conversation with Mr. Casazza that the City could not legally pay more

than $36.42 per ton. Third, after the conversation with Mr. Casazza, but before

International Salt delivered any additional salt, Mr. Hannon again informed International

Salt in writing that the City would not pay more than the original contract price. Fourth,

every written purchase order the City issued for additional salt specified that it would pay

$36.42 per ton. See Kuwaiti Danish Computer Co. v. Digital Equipment Corp., 428

Mass. 459, 468 (2003) (reliance on a verbal statement that conflicted with the same

party's written statement unreasonable as a matter of law). Finally, International Salt

could not reasonably have believed that Mr. Casazza had the power to bind the City

through informal, verbal promises. It sells salt to government clients exclusively through

19

the public bidding process and was well aware that government purchasers must follow
public bidding rules and make all contracts in writing. International Salt failed to prove
that any reliance on a belief that the City would pay more than $36.42 per ton was
reasonable.

>   *B.*   *International Salt Cannot Recover Under Quantum Meruit / Unjust*
>         *Enrichment.*

For the same reasons discussed in the preceding sections, it is legally impossible
to recover from the City on theories of quantum meruit or unjust enrichment. Contracts
with Massachusetts cities and towns are enforceable only if made in accordance with
municipal contracting statutes and "a party cannot evade the statutory limitations on a
municipality's contracting powers by rendering services and subsequently seeking
recovery based on alternative theories." Park Drive Towing v. City of Revere, 442 Mass.
80, 84, n.7 (2004). See also, Central Tow Co., Inc. v. City of Boston, 371 Mass. 341, 345
(1976); Adalian Bros., Inc. v. City of Boston, 323 Mass. 629, 632 (1949).

## V.   There is No "Emergency" Exception to the Written Contract and Mayoral Signature Laws, and the Court Must Impose Those Requirements Regardless of Whether There is an Emergency.

International Salt, again pointing to the emergency exemption to public bidding
rules included in G. L. c. 30B, § 8, asks this Court to ignore all municipal contracting
laws because of the "emergency" is has alleged in this case. There is, however, no
"emergency" exception to the statutory requirement that a contract be in writing and
approved in writing by the mayor in order to be enforceable. See Ma. St. 1890, c. 418, §
6, as amended, and G. L. c. 43, § 29. The Legislature created such exceptions from
different laws, such as the public bidding procedures of G. L. c. 30B, § 8, and the
appropriation rules of Ma. St. 1909, c. 486, § 16, but it has not created any exceptions

20

from the writing and mayoral signature laws. Courts must apply the statutory

requirements, not write exceptions into the statute where the Legislature has not done so.

See Massachusetts Bay Transportation Authority v. Massachusetts Bay Transportation

Authority Retirement Board, 397 Mass. 734, 740 (1986).

> *A. This Court Does Not Need To Consider Whether There Can Ever Be Emergency Exemptions to the Statutory Writing and Mayoral Signature Requirements, Because There Is No Reason the Law Could Not Have Been Complied With In This Case.*

As discussed below, the Legislature and Supreme Judicial Court have determined

that there is no "emergency" exception to the requirement that municipal contracts be in

writing and bear the written approval of the mayor. In this case, there is no need for the

Court to even consider the rule in the first place, though, because the "emergency"

alleged by International Salt could not possibly justify waiver of the requirements.

The only policy rationale a court could resort to in order to write an emergency

exception into Ma. St. 1890, c. 418, § 6, as amended, is that there might be times when

the public benefit served by entering contracts quickly to respond to an emergency

outweighs the benefit the public receives from strict application of public contracting

statutes meant to prevent waste and fraud. That is the reason G. L. c. 30B, § 8, allows

cities not to follow specific rules when the time required to do so would threaten health or

safety.

That reason has no force in this case. The City was not put to a choice between

getting a written contract with mayoral approval or getting salt quickly enough to protect

public safety. The parties exchanged at least six written documents between February 7

and February 18, 2005, and easily could have memorialized an actual agreement in that

time, giving plenty of time to ward off a hypothetical emergency that International Salt

21

suggests could have occurred in late March. Likewise, there was more than enough time
to get mayoral approval.

*B.    Statutory Language Precludes an Emergency Exemption.*

The text of Ma. St. 1890, c. 418, § 6, as amended by Ma. St. 1998, c. 262, § 1,
like that of G. L. c. 43, § 29, is plain and unambiguous in requiring a written contract
bearing written mayoral approval without providing an "emergency" exception. The
statute explicitly imposes those requirements on "all contracts made by any department."
Id. (emphasis added.) The words in a statute must be given their ordinary meaning, G. L.
c. 4, § 6; U.S. Jaycees v. Massachusetts Comm'n Against Discrimination, 391 Mass. 594,
600-601 (1984). The term "all" can only be read to include even those contracts made to
help deal with emergency situations. Although a procurement officer might enter into a
contract pursuant to G. L. c. 30B, § 8, that contract would still be a "contract made by
any department" subject to the "all contracts" language in Ma. St. 1890, c. 418, § 6, as
amended.

Moreover, the language of St. 1890, c. 418, § 6, as amended, is specifically
tailored to apply the writing and mayoral signature requirements when officials invoke
emergency contracting powers allowing waiver of other contracting rules. The statute
requires that contracts be enforceable only if the City Auditor "has certified thereon that
an appropriation is available therefore or has cited thereon the statute under authority of
which the contract is being executed without an appropriation." Id. (emphasis added).
That requirement, added by Ma. St. 1950, c. 216, § 1, makes it clear that there is no
general "emergency" exception to the statute because it was drafted to apply to both
ordinary contracts, and contracts that utilized statutory authority to exceed appropriations

22

in the case of emergency. The City Charter ordinarily requires that funds for contracts be appropriated in advance, but it allows departments to exceed appropriations in cases of "extreme emergency threatening" health and safety. Ma. St. 1909, c. 467, § 16. By carving out a way for the City auditor to certify even those emergency contracts, the Legislature made it clear that Ma. St. 1890, c. 418, § 6, as amended, truly applies to all contracts.

### C.    Legislative History Demonstrates That There is No Emergency Exception.

Legislative history also reveals that the Legislature contemplated emergency contracts, knew how to exempt them from statutory requirements, but repeatedly chose not to craft such an emergency exemption to either Ma. St. 1890, c. 418, § 6, as amended, or G. L. c. 43, § 29. The Legislature first passed Boston's writing and mayoral signature law in 1890. In 1939, it amended the law to bring Suffolk County officers within its scope. Ma. St. 1939, c. 156, § 2. The Legislature had already considered the possibility of emergency contract situations by that time. For example, it had given Boston city departments the ability to exceed appropriations in cases of "extreme emergency," Ma. St. 1909, c. 467, § 16, and given other cities the power not to engage in public bidding in cases of "special emergency," G. L. c. 43, § 28, inserted by Ma. St. 1915, c. 267, § 28. Yet it still did not include an emergency exemption to the rule that "all contracts" be in writing and signed by the mayor.[5]  In 1950, the Legislature amended the statute again, adding the requirement that the City Auditor certify each contract. Ma. St. 1950, c. 216,

---

[5] There can be no doubt that the Legislature was aware of the emergency exceptions created from appropriation rules in 1909; section two of Ma. St. 1939, c. 156 amended the writing and signature statute, while section one of Ma. St. 1939, c. 156 amended a portion of St. 1909, c. 467.

23

§ 1. The Legislature again chose not to add an emergency exception, and as discussed

above, amended the statute with language that made it clearer that the statute applied to

emergency contracts.

The pattern continued, and the Legislature revisited the statute in 1953, 1955,

1992, and as recently as 1998, each time choosing not to include an emergency

exception.[6] Indeed, just three years after the 1989 enactment of G. L. c. 30B, the

Legislature amended Boston's writing and mayoral signature statute to alter its threshold

dollar amount. Ma. St. 1992, c. 373, § 1. The Legislature was clearly aware of the

emergency provisions it had just created in G. L. c. 30B, § 8, but chose not to add a

similar exception to the writing and mayoral signature statute.

Just like the City's writing and mayoral signature statute, the history of G. L. c.

43, § 29, makes it clear that the Legislature deliberately chose not to create an emergency

exception. Chapter forty-three was originally enacted in 1915 to create city charters for

cities other than Boston. The version of section twenty-nine enacted at that time was

similar in all material respects to the current general law and Boston statute.[7] It applied

the writing requirement, the mayoral signature requirement, and a departmental signature

---

[6] See, Ma. St. 1952, c. 376; Ma. St. 1955, c. 60; Ma. St. 1992, c. 373, § 1; Ma. St. 1998,
c. 262, § 1.

[7] Ma. St. 1915, c. 267, Pt. I, § 29, read, in relevant part:

> "All contracts made by any department, board or commission in which the
> amount involved is two hundred dollars or more shall be in writing, and no such
> contract shall be deemed to have been made or executed until the approval of the
> mayor and of the department or board making such contract is affixed thereto."

The statute has been amended a number of times to increase the threshold dollar amount
that triggers it, and to accommodate the fact that certain cities now have "city managers"
rather than mayors.

24

requirement, to "all" contracts. Ma. St. 1915, c. 267, Pt. I, § 29. Its omission of an emergency exception is critical. In the section immediately preceding section twenty-nine, the Legislature created public bidding rules for municipal contracts similar to those now found in G. L. c. 30B, and explicitly created an exception for cases of "special emergency involving the health or safety of the people." G. L. c. 43, § 28, inserted by Ma. St. 1915, c. 267, § 28.[8] The Legislature deliberately chose to waive certain public bidding and advertising requirements in cases of "special emergency," but writing the very next section of the statute just as deliberately chose to apply the writing and signature requirements to "all" contracts regardless of emergency. It is beyond debate that in passing G. L. c. 43, § 29, the Legislature chose not to create exemptions for emergency contracting situations, and that deliberate decision cannot be ignored by a court applying the Legislature's enactments. The legislature amended sections twenty-eight and twenty-nine simultaneously on four occasions, but never disturbed the distinction between the sections with respect to emergencies. Ma. St. 1928, c. 300, §§ 1, 2; Ma. St. 1951, c. 25, §§ 1, 2; Ma. St. 1967, c. 79, §§ 3, 4; Ma. St. 1974, c. 199, §§ 2, 3.

The strong parallels between G. L. c. 43, § 28 (repealed) and the more detailed and comprehensive public bidding scheme subsequently created by G. L. c. 30B, are particularly informative to the present case. International Salt seeks to enforce an alleged non-competitive, unadvertised, implied contract never reduced to writing or approved by

---

[8] G. L. c. 43, § 28, was repealed in 1984 by Ma. St. 1984, c. 484, § 42, but stood alongside G. L. c. 43, § 29, in substantially the same form from 1915 until 1984. Section twenty-eight, like the more detailed public procurement scheme of G. L. c. 30B that took its place, required that no city contract for the purchase of goods could be entered into unless the city invited bids through public advertisement, received competitive bids, and opened them in public. It provided that certain purchases required public advertising and bidding "except in cases of special emergency involving the health or safety of the people of their property."

the mayor. It suggests that the limited exemptions from bidding rules created by G. L. c. 30B, § 8, for emergencies justify ignoring strict laws requiring written contracts signed by the mayor, even though those laws are not part of G. L. c. 30B at all. The Legislature has already rejected that approach, though, and deliberately crafted writing and signature requirements that apply even in cases (unlike this) where emergency exceptions to bidding rules are effective.

### D.    Massachusetts Case Law Disposes of the Question.

There can be no doubt that there is no "emergency" exception to the writing and mayoral signature requirements because the Supreme Judicial Court has already determined that allegations of "emergency" do not affect application of G. L. c. 43, § 29 and its Boston analogue, Ma. St. 1890, c. 428, § 6, as amended. In City of Quincy v. Brooks-Skinner, Inc., 325 Mass. 406 (1950), the plaintiff worked on a temporary expansion to the city's hospital to meet what the city deemed a "war emergency." Id. at 408-409. The work was never advertised or bid out, as required by G. L. c. 43, § 28 (now repealed), but the mayor signed a submission he had requested from the plaintiff. The department head of the hospital never affixed approval in writing, as required by G. L. c. 43, § 29. In concluding that the city had a valid defense to any claim for payment, the court quoted G. L. c. 43, § 29, and stated that "there was no compliance with those requirements." Id. at 412. It stated that the purported contract also violated another charter provision related to detailed appropriations. Id. The court determined that the contract's potential "emergency" nature did not eliminate the need to comply with those statutory contract requirements, which did not have emergency exceptions. It dismissed arguments that the emergency might save the contract succinctly: "[s]ince the contract,

26

for reasons just stated, was not enforceable against the city, it is unnecessary to decide whether a 'special emergency' existed within the meaning of G.L. (Ter.Ed.) c. 43, § 28, so as to make the requirements of that section relating to advertising for bids inapplicable." Id. at 413, n.3. That settles the question in the instant case. Section twenty-eight was similar to G. L. c. 30B, and the court declared that its "emergency" exception from public advertising requirements did not eliminate the need for strict compliance with G. L. c. 43, § 29.

The Supreme Judicial Court again clarified that emergency circumstances do not eliminate the need for a written contract approved by the mayor in Massachusetts General Hospital v. City of Revere, 385 Mass. 772 (1982), *reversed on other grounds* City of Revere v. Massachusetts General Hospital, 463 U.S. 239 (1983). In that case, the Revere police shot a fleeing robbery suspect then rushed him to Massachusetts General Hospital for treatment of his wounds. Id. at 773. The hospital sought to recover the cost of treatment from Revere on contract grounds, but the Court held that it could not because a variety of statutory requirements for enforceable municipal contracts had not been met. Most relevant to the instant case, the court treated the writing and mayoral signature requirements of G. L. c. 43, § 29, as distinct from and unaffected by emergency provisions contained in different statutory sections. "[S]everal statutory requirements for a valid contract were not met. All contracts made by city departments in excess of $2,000 must be in writing and approved by the mayor. G.L. c. 43, s 29. Except in an emergency, a city department could not incur liabilities in excess of its appropriation. G.L. c. 44, s 31. In an emergency, arguably the case here, the city council must approve the expenditure. G.L. c. 44, s 31." Id. at 775. The import is clear; the Supreme Judicial

27

Court has examined the language of G. L. c. 43, § 29 (and its analogue, Ma. St. 1890, c.
416, § 6, as amended) and determined that it does not contain an emergency exception. It
is not for another court to write one in.

## VI.    International Salt Did Not Prove That a New Contract Was Entered Into For A Unit Price Greater Than $36.42 Per Ton Under Ordinary Contract Law.

International Salt's claims must be dismissed under municipal contracting laws,

but the same result is required under ordinary contract law because International Salt did

not prove that the City accepted an offer to purchase salt at any other price than $36.42

per ton. International Salt alleges a verbal or implied contract, at an unspecified price

greater than $36.42 per ton. The evidence at trial, however, clearly demonstrated that the

City explicitly refused to pay a higher price, and that it repeatedly offered to purchase

more salt at $36.42 per ton. The evidence also shows that International Salt accepted the

City's offer by delivering salt, and that it did no more than make ineffective proposals to

alter the terms of the City's offer.

*A.    No offer for a higher price was accepted prior to February 10, 2005 because the City's purchasing agent informed International Sat that it could not accept any price other than $36.42 per ton on February 8, 2005 (Stip. Fact #21).*

*B.    There Was No Acceptance of a Higher Price By Commissioner Casazza During the February 10, 2005 Phone Call.*

International Salt did not prove any offer and acceptance of a price in excess of

$36.42 per ton during the phone call between Commissioner Casazza and Mr. Jones on

February 10, 2005. As discussed previously, even if Mr. Jones made a verbal offer to sell

at a higher price, Mr. Casazza, Mr. Jones, and Mr. Thompson all testified that Mr.

Casazza clearly stated that price was not his concern and that International Salt would

have to discuss price with other representatives of the City. That statement cannot be
deemed an acceptance of a higher price or any mechanism for setting a higher price.

C.     *International Salt's February 10 and February 11, 2005 Letters Were Not
       Offers That Were Accepted.*

On February 10, 2005, Mr. Jones sent Mr. Casazza a letter stating that

International salt would sell the City more salt, but that the price was not determined and
it would reserve its right to seek fair market value in court. (Stip. Fact #26.) On
February 11, 2005, counsel to International Salt sent a similar letter to Mr. Hannon.
(Stip. Fact #28). On February 11, 2005, the City issued a purchase order to International
Salt, specifying a quantity of 25,000 tons of salt at a purchase price $36.42 per ton. (Stip.
Fact #31). This operated as an express rejection of International Salt's offer to provide
salt at an unspecified price that might exceed $36.42 per ton.

D.     *International Salt's February 18, 2005 Letter Was Not An Offer That Was
       Accepted.*

Mr. Jones sent a letter to Mr. Hannon on February 18, 2005 indicating that

International Salt would provide rock salt in excess of 75,000 tons, and that the City
would be invoiced at $36.42 per ton – with International Salt reserving its right to seek a
price increase from a court. (Stip. Fact #30). The City did not accept that proposal.[9] Mr.
Jones's letter was written after receiving (and beginning to supply, Stip. Fact #29) the
City's February 11, 2005 purchase order specifying a purchase price of $36.42 per ton.
International salt was not free to both accept the order, and unilaterally propose a

_____

[9] The City responded with two additional purchase orders on March 11, 2005, and April
15, 2005, specifying 3,000 tons and 50 tons of rock salt, respectively, at $36.42 per ton.

29

different price. That International Salt is a merchant under the Code[10] is significant: in a

contract between two parties where one party is a merchant and the other is not, the terms

of the offer govern and the proposed changes of terms do not become part of the contract.

Mass. Gen. L. c. 106 § 2-207(2). Therefore, the February 18, 2005 letter was an

acceptance of the City's offer to purchase additional salt at $36.42 per ton that simply

made an ineffective, unilateral proposal to change the price. (If International Salt's

February 18, 2005 letter is read as a rejection of the City's offer, then there is no contract.

The City did not "implicitly" agree to a new price because the City had already begun

accepting salt over 75,000 tons before it received the letter. (Stip. Fact #29.))

## VII.   International Salt Failed To Prove That Fair Market Value of Bulk Rock Salt in Boston Exceeded $42.36 Per Ton In February 2005.

Although the City never agreed to a price higher than $36.42, International Salt

asks this court to declare that the City implicitly agreed to pay approximately $56 per ton.

It argues that this was the fair market value of bulk rock salt in Boston in February 2005.

International Salt did not meet its burden of proving fair market value, though. At most,

the evidence at trial showed that fair market value was somewhere around $42 per ton.

"Fair market value" is defined as the "price at which the property would change

hands between a willing buyer and a willing seller, neither being under any compulsion

to buy or sell and both having reasonable knowledge of the relevant facts." Bernier v.

Bernier, 449 Mass. 774, 780 n. 8 (2007). That figure was less than $42.36 per ton. By

letter dated February 7, 2005, International Salt's Vice-President, Daniel Thompson,

---

[10] Under the Code, a "merchant" is "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction." Mass. Gen. L. c. 106 § 2-104(1). International Salt inarguably satisfies this definition with respect to rock salt.

offered sell the City salt in excess of 75,000 tons for $42.36 per ton. (Stip. Fact #16.) Mr. Thompson testified at trial that during a phone conversation with Mr. Hannon on February 8th or 9th, he stated that International Salt might be open to negotiating a lower price than $42.36 per ton. On February 18, 2005, Robert Jones, International Salt's CEO sent a letter to Mr. Hannon again offering to sell bulk rock salt at a price of $42.36 per ton. That was the only evidence at trial that showed the price at which a willing seller would have provided bulk rock salt in Boston in 2005.

Despite its clear willingness to sell bulk rock salt in Boston at or below $42.36 per ton in February 2005, International Salt now claims that the fair market value was approximately $56 per ton. It presented two strands of evidence to support this claim: (1) reports of a few salt bids submitted in early 2005, and (2) testimony about ocean freight shipping costs in February 2005. Neither meets International Salt's burden to prove fair market value.

With respect to salt bids in early 2005, International Salt introduced two sheets entitled 2004 Bid Recap (Exhibit 25) and 2005 Bid Recap (Exhibit 26) that documented some public salt bids from January 2005 through March 2005. Although these sheets provide evidence of the bid price of salt for the municipalities listed, they do not prove the fair market value of bulk rock salt in Boston. International Salt introduced these sheets during the testimony of Daniel Thompson, but only elicited testimony regarding the bid for Salem Co-Op in New Jersey, which does not clarify fair market value in Boston. There are significant differences between the bids listed for early 2005 and the City's purchase that cast serious doubt on the relevance of those bids to fair market value for the City's purchase. First, every city or town listed on the 2005 Bid Recap, including

31

those in Massachusetts, are well outside of Boston. International Salt's regional stockpile
of rock salt is located in Boston. It did not explain how prices of bids for other cities
were affected by distance from its stockpile. Second, every bid listed on the 2005 Bid
Recap involves significantly smaller quantities of salt than the 27,000 extra tons the City
ordered. In fact, the largest Massachusetts bid listed was for 1,000 tons, less than five
percent of the City's additional purchase. Again, International Salt did not introduce any
testimony that bids for radically smaller quantities of salt are relevant to the fair market
value of the City's purchase. Finally, the 2004 Bid Recap, which lists only
Massachusetts bids, indicates that International Salt bid a per ton price in excess of $50
six times, and a per ton price in excess of $49 sixteen times, before November 1, 2004.
International Salt did not explain why these bids were so high during a period that
predated the increased shipping costs that it now claims raised fair market value in
Boston to $56 in February. If these bids were irrelevant to the pre-winter bid it gave
Boston for $36.42, it is distinctly possible that the few high bids documented in early
2005 were irrelevant to the fair market value of the City's purchase in 2005. After all,
the 2005 bids were for significantly smaller quantities of salt to be delivered to locations
far away from International Salt's stockpile.

Instead of attempting to explain the relevance of the Bid Recap sheets,
International Salt relied almost exclusively on testimony regarding the cost of sending a
"spot" ship to Boston to prove fair market value. It claimed that the $36.42 bid it initially
gave the City was based on shipping rates of approximated $13 per ton, that it had to ship
in additional salt to fulfill the City's additional order, and that the rate for such "spot"
ships in February 2005 was approximately $30 per ton. International failed, however, to

32

prove that it paid such shipping rates in order to meet the City's additional order, and therefore the Court cannot impose liability above $42 per ton. (Note: in addition to failing to prove that it, in effect, shipped salt at $30 per ton, International Salt failed to prove why a $17 increase in shipping costs would translate into a $20 increase in price.)

The only documents introduced at trial indicated that ships that carried salt to Boston during this period were not "spot" ships, but were ships that sailed under contract rates of approximately $13 per ton. Seeking to get around that unhelpful documentation, International Salt put on a witness. Tom Labash testified that, because of the City's order, International Salt diverted to Boston a cheap ship under contract that was sailing to New Jersey. He testified that International Salt then had to replace that ship with an expensive "spot" ship to New Jersey. Thus, International Salt asks this court to find that, in effect, it paid over $30 per ton to ship the additional salt to Boston. It failed to prove this.

Mr. Labash testified that a "spot" ship had to be sent to New Jersey to replace the ship diverted to Boston. He did not, however, testify as to the name of the "spot" ship, the date it sailed to New Jersey, or its actual shipping rate. More surprisingly, International Salt did not introduce any documentation regarding the name, date, or rate of the "spot" ship it allegedly sent to New Jersey, despite the fact that it clearly possesses the documents which would support or disprove its allegation. Its failure is critical, because on cross-examination International Salt's Vice-President, Mr. Thompson, testified that the "spot" shipping rate for salt fell back into the "high teens" (presumably $17-$19 per ton) in the spring of 2005. International Salt did not offer any evidence to the court about when it allegedly sent a "spot" to replace salt sent to Boston. It is distinctly possible that, if it sent an extra shipment to New Jersey at all, it did so in the

33

spring of 2005. If that was the case, it would not have paid the extra $17 per ton that it claims, but only an extra $4-$6 per ton. The difference is dramatic. Without having presented any evidence to support its high figures, despite the fact that it possesses whatever documents would show the actual price, International Salt is not entitled to $56 per ton.

Finally, International Salt did not provide any testimony that could reconcile its testimony that it only enters into contracts for delivery of seventy percent of its local salt contracts, that 2004-2005 was an unusually snowy winter that resulted in very high salt demand, and that it only sent what was, in effect, a "spot" ship to Boston in response to the City's order of more than 75,000 tons of salt.

## VIII.    Conclusion

For the foregoing reasons, all of International Salt's claims should be denied, and the Court should make the findings of fact and conclusions of law requested by the City.

> Respectfully submitted,
> DEFENDANT, CITY OF BOSTON
> William F. Sinnott
> Corporation Counsel
> By its attorney:
>
> /s/ Adam Cederbaum
> Scott C. Holmes, BBO #544545
> Adam N. Cederbaum, BBO #661549
> Assistant Corporation Counsel
> City of Boston Law Department
> Room 615, City Hall
> Boston, MA 02201
> (617) 635-4042 (SH)
> (617) 635-4030 (AC)

February 15, 2008

34

I, Adam Cederbaum, hereby certify that a copy of the above filing was served upon all parties using the Court's electronic notification system, on February 15, 2008.

/s/ Adam Cederbaum
Adam Cederbaum

35

## STATUTORY ADDENDUM

### Chapter 30B

G.L. c. 30B §5    -   -   -   -   -   -   -   A1
G.L. c. 30B §8    -   -   -   -   -   -   -   A3
G.L. c. 30B §17   -   -   -   -   -   -   -   A4

### City Charter Authority and Signature Requirements

Ma. St. 1890, c. 418, §6   -   -   -   -   -   -   A5
Ma. St. 1939, c. 156, §2   -   -   -   -   -   -   A8
Ma. St. 1950, c. 216, §1   -   -   -   -   -   -   A10
Ma. St. 1952, c. 376   -   -   -   -   -   -   A11
Ma. St. 1955, c. 60   -   -   -   -   -   -   A13
Ma. St. 1992, c. 373, §1   -   -   -   -   -   -   A14
Ma. St. 1998, c. 262, §1   -   -   -   -   -   -   A15

### General Law Authority and Signatory Requirements

G.L. c. 43, §29   -   -   -   -   -   -   -   A17
Ma. St. 1915, c. 267, §29   -   -   -   -   -   -   A18-A-20
Ma. St. 1928, c. 300, §§1, 2   -   -   -   -   -   -   A21
Ma. St. 1974, c. 199, §§2, 3   -   -   -   -   -   -   A23

### General Laws Precursor to G.L. c. 30B

Ma. St. 1915, c. 267, §28   -   -   -   -   -   -   A19

### City Charter Provision Regarding Appropriations

Ma. St. 1909, c. 486, §16   -   -   -   -   -   -   A24

Westlaw.

M.G.L.A. 30B § 5

Page 1

▷

**Effective: July 01, 2000**

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. **ADMINISTRATION OF THE GOVERNMENT** (CH. 1-182)
TITLE III. **LAWS RELATING TO STATE OFFICERS** (CH. 29-30B)
CHAPTER 30B. **UNIFORM PROCUREMENT ACT**
  → **§ 5. Competitive sealed bidding procedures**

(a) Except as permitted under section six or section eight, award of procurement contracts in the amount of $25,000 or more, other than contracts for the procurement of real property, shall conform to the competitive sealed bidding procedures set forth in this section.

(b) A procurement officer shall issue an invitation for bids for a procurement contract. The invitation for bids shall include:

(1) the time and date for receipt of bids, the address of the office to which bids are to be delivered, the maximum time for bid acceptance by the governmental body;

(2) the purchase description and all evaluation criteria to be utilized pursuant to paragraph (e); and

(3) all contractual terms and conditions applicable to the procurement.

The invitation for bids may incorporate documents by reference; provided, however, that the invitation for bids specifies where prospective bidders may obtain the documents. The procurement officer shall make copies of the invitation for bids available to all persons on an equal basis.

(c) The procurement officer shall give public notice of the invitation for bids a reasonable time prior to the date for the opening of bids. The notice shall:

(1) indicate where, when and for how long invitations for bids may be obtained;

(2) describe the supply or service desired, and reserve the right of the governmental body to reject any or all bids;

(3) if award of the contract is subject to the approval of any board, committee, commission or other body, so state and identify each such body;

(4) remain posted, for at least two weeks, in a conspicuous place in or near the offices of the governmental body until the time specified in the invitation for bids; and

(5) be published at least once, not less than two weeks prior to the time specified for the receipt of bids, in a newspaper of general circulation within the area served by the governmental body.

For procurements in the amount of twenty-five thousand dollars or more, or such larger amount as may be established by the state secretary, the procurement officer shall also place the notice in any publication established by the state secretary for the advertisement of such procurements.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A1

M.G.L.A. 30B § 5

The procurement officer may distribute copies of the notice to prospective bidders, and may compile and maintain lists of prospective bidders to which notices may be sent.

A city or town which regularly publishes a periodical listing municipal contracting opportunities may apply to the state secretary for permission to utilize such periodical in lieu of advertising in a newspaper of general circulation. The state secretary, after notice and an opportunity for interested persons to present their views, may grant, renew, or revoke permission for said city or town to utilize such periodical in lieu of newspaper advertising for procurements or classes of procurements not to exceed such amount as may be established by the state secretary. Such permission shall remain in effect for a specified period not to exceed three years. In granting, renewing, or revoking such permission, the state secretary shall consider whether the periodical provides prospective contractors with reasonable notice of contracting opportunities, taking account of such factors as circulation, accessibility, reliability, and cost of the periodical. Such permission and any renewal or revocation thereof shall be in writing filed with the city or town clerk, the inspector general, and the state secretary.

(d) The procurement officer shall open bids publicly either (1) at a meeting subject to the provisions of section eleven A 1/2 of chapter thirty A, section nine G of chapter thirty-four or section twenty-three B of chapter thirty-nine, in the presence of a quorum, and the names of all bidders and the amounts of their bids shall be entered in the minutes, or (2) in the presence of one or more witnesses, and the procurement officer and said witnesses shall sign a statement under penalties of perjury listing the names of all bidders and the amounts of their bids and declaring that said list is a complete and accurate list of bids opened in the presence of said witnesses. Such minutes or statement, or a certified copy thereof, shall be filed with the contract.

(e) The procurement officer shall evaluate a bid based solely on the requirements and criteria set forth in the invitation for bids. Such criteria shall include the standards by which the procurement officer will determine acceptability as to quality, workmanship, results of inspections and tests, and suitability for a particular purpose.

(f) The procurement officer shall unconditionally accept a bid without alteration or correction, except as provided in this paragraph. A bidder may correct, modify, or withdraw a bid by written notice received in the office designated in the invitation for bids prior to the time and date set for the bid opening. After bid opening, a bidder may not change the price or any other provision of the bid in a manner prejudicial to the interests of the governmental body or fair competition. The procurement officer shall waive minor informalities or allow the bidder to correct them. If a mistake and the intended bid are clearly evident on the face of the bid document, the procurement officer shall correct the mistake to reflect the intended correct bid and so notify the bidder in writing, and the bidder may not withdraw the bid. A bidder may withdraw a bid if a mistake is clearly evident on the face of the bid document but the intended correct bid is not similarly evident.

(g) The procurement officer shall award the contract to the lowest responsible and responsive bidder. A contract requiring payment to the governmental body of a net monetary amount shall be awarded to the highest responsible and responsive bidder. The procurement officer shall award the contract by written notice to the selected bidder within the time for acceptance specified in the invitation for bids. The time for acceptance may be extended for up to 45 days by mutual agreement between the governmental body and the apparent lowest responsible and responsive bidder or, for a contract requiring payment to the governmental body, by mutual agreement between the governmental body and the highest apparent responsible and responsive bidder.

Current through Chapter 24 of the 2008 2nd Annual Sess.

© 2008 Thomson/West

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A2

Westlaw.

M.G.L.A. 30B § 8

c

**Effective: [See Text Amendments]**

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. **ADMINISTRATION OF THE GOVERNMENT** (CH. 1-182)
TITLE III. **LAWS RELATING TO STATE OFFICERS** (CH. 29-30B)
CHAPTER 30B. **UNIFORM PROCUREMENT ACT**
    →**§ 8. Emergency procurements**

Whenever the time required to comply with a requirement of this chapter would endanger the health or safety of the people or their property a procurement officer may make an emergency procurement without following that requirement. An emergency procurement shall be limited to only supplies or services necessary to meet the emergency and shall conform to the requirements of this chapter to the extent practicable under the circumstances. The procurement officer shall make a record of each emergency as soon after the procurement as practicable, specifying each contractor's name, the amount and the type of each contract, a listing of the supply or service provided under each contract, and the basis for determining the need for an emergency procurement.

The procurement officer shall submit a copy of this record at the earliest possible time to the state secretary for placement in any publication established by the state secretary for the advertisement of procurements.

Current through Chapter 24 of the 2008 2nd Annual Sess.

© 2008 Thomson/West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A3

Westlaw.

Page 1

M.G.L.A. 30B § 17

C

**Effective: [See Text Amendments]**

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. **ADMINISTRATION OF THE GOVERNMENT** (CH. 1-182)
TITLE III. **LAWS RELATING TO STATE OFFICERS** (CH. 29-30B)
CHAPTER 30B. **UNIFORM PROCUREMENT ACT**
→ **§ 17. Writing requirement; invalidation of contracts; forfeiture; civil actions**

(a) All contracts in the amount of five thousand dollars or more shall be in writing, and the governmental body shall make no payment for a supply or service rendered prior to the execution of such contract.

(b) Subject to the provisions of section three A of chapter forty, a contract made in violation of this chapter shall not be valid, and the governmental body shall make no payment under such contract. Minor informalities shall not require invalidation of a contract.

(c) A person who causes or conspires with another to cause a contract to be solicited or awarded in violation of a provision of this chapter shall forfeit and pay to the appropriate governmental body a sum of not more than two thousand dollars for each violation. In addition, the person shall pay double the amount of damages sustained by the governmental body by reason of the violation, together with the costs of any action. If more than one person participates in the violation, the damages and costs may be apportioned among them.

(d) The inspector general shall have authority to institute a civil action to enforce paragraph (c) if authorized by the attorney general.

Current through Chapter 24 of the 2008 2nd Annual Sess.

© 2008 Thomson/West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

A4

# ACTS

AND

# RESOLVES

PASSED BY THE

# General Court of Massachusetts,

IN THE YEAR

# 1890,

TOGETHER WITH

THE CONSTITUTION, THE MESSAGES OF THE GOVERNOR,
LIST OF THE CIVIL GOVERNMENT, TABLES SHOWING
CHANGES IN THE STATUTES, CHANGES OF
NAMES OF PERSONS, ETC., ETC.

———————

PUBLISHED BY THE

SECRETARY OF THE COMMONWEALTH.

——————



BOSTON:

WRIGHT & POTTER PRINTING CO., STATE PRINTERS,

No. 18 POST OFFICE SQUARE.

1890.

A5

**370**

1890. — CHAPTERS 417, 418.

**Construction of 1888, 389.**

SECTION 6. Chapter three hundred and eighty-eight of the acts of the year eighteen hundred and eighty-eight shall not be construed to apply to licensed pawnbrokers, nor to have repealed or affected section thirty-four of chapter one hundred and two of the Public Statutes.

**Repeal of 1888, 389.**

SECTION 7. Chapter two hundred and fifty-two of the acts of the year eighteen hundred and eighty-five is hereby repealed.

*Approved June 16, 1890.*

**Chap.417**  AN ACT TO AMEND AN ACT TO INCORPORATE THE CITY HOSPITAL IN THE CITY OF QUINCY.

*Be it enacted, etc., as follows:*

**Amendment to 1889, 197, §1.**

SECTION 1. Section two of chapter one hundred and seven of the acts of the year eighteen hundred and eighty-nine is hereby amended by inserting after the word "hospital" in the sixth line thereof, the words: — and said corporation may also, subject to said limitation of amount, purchase and hold real estate in the city of Quincy: — so that said section as amended shall read as follows: — *Section 2.* Said corporation may receive and hold real and personal estate which may from time to time be given, granted, bequeathed or devised to it, and accepted by the thousand dollars, for the uses and purposes of said hospital; and said corporation may also, subject to said limitation of amount, purchase and hold real estate in the city of Quincy, provided always that both the principal and income thereof shall be appropriated according to the terms of the donation, devise or bequest.

SECTION 2. This act shall take effect upon its passage.

*Approved June 16, 1890.*

**Chap.418**  AN ACT RELATIVE TO OFFICERS AND DEPARTMENTS IN THE CITY OF BOSTON.

*Be it enacted, etc., as follows:*

**Officers, &c., of Boston, to give bond, &c. to city; and such bond to run to successor, &c.**

SECTION 1. Every person now or hereafter having the joint charge of a department of the city of Boston shall hold office for such term, not exceeding three years, beginning with the first day of May in the year of his appointment, as the city council may by ordinance determine; and until his successor is appointed and confirmed; provided, however, that all members of boards and all officers shall hold office for such terms as may be specified in this rela-

**371**

1890. — CHAPTER 418.

**Terms of officers, &c. when to begin.**

tion creating them and until their respective successors are appointed and confirmed, but such terms shall begin with the first day of May in the year of appointment. All officers, except election officers and those above named, appointed by the mayor and confirmed by the board of aldermen of said city, shall hold office for terms of one year beginning with the first day of May in the year of appointment and until their respective successors are appointed and confirmed. Any officer appointed by the mayor and confirmed by the board of aldermen of said city may be removed by the mayor for such cause as he shall deem sufficient and shall assign in his order for removal.

**Term "subordinate" defined.**

SECTION 2. The term "subordinate" in this act, and in all other acts relating to the city of Boston or its departments, shall be construed to include only assistants, deputies, clerks and other officers, appointed by an officer or board in charge of a department, and paid a yearly salary.

**Subordinate to hold office until removed.**

SECTION 3. Every subordinate of a department of said city shall continue to hold his office until removed by the officer or board in charge of the department, for such cause as he, or it, shall deem sufficient, and shall assign in the order of removal.

**Contracts to be made by officer in charge, &c.**

SECTION 4. Every officer or board in charge of a department in said city, when authorized to erect a new building or to make structural changes therein, shall make contracts therefor, not exceeding five, each contract to be subject to the approval of the mayor; and when about to do any work or to make any purchase, the estimated cost of which amounts to or exceeds two thousand dollars, shall, unless the mayor give a written authority to do otherwise, invite proposals therefor by advertisements in not more than four daily newspapers published in said city, such advertisements to state the time and place for opening the proposals, in answer to said advertisements, and reserving in such invitations the right to the officer or board to reject any or all proposals.

**Proposals to be by sealed bids.**

SECTION 5. Every proposal for doing such work or making such sale shall be accompanied by a suitable bond, or certified check or certificate of deposit, for the faithful performance of such proposal, and all such proposals shall be kept by the officer or board inviting the same, and shall be open to public inspection after said proposals have been accepted or rejected.

## 1890.—CHAPTER 416.   369

SECTION 2. Every person engaged in the business mentioned in section one shall give to each borrower or depositor a receipt, ticket or card, inscribed with the name of the lender, the article or articles pledged, the description of the property as required in section one, the name date when made, the date when payable; which said receipt, ticket or card shall be numbered to correspond with the number of the transaction on said book.

SECTION 3. Said book shall at all times be open to the inspection of the board of police, the superintendent and chief inspector of police, of the city of Boston, the chief of the district police and the chief of police and selectmen of their respective cities or towns, or any or either of them, or to any officer who shall be specially authorized in writing for that purpose by any or either of them, and who exhibits such written authority; and the property described in said book shall be exhibited to said officers or either of them on their demand.

SECTION 4. Every person engaged in said business as aforesaid, or his agent or other person in charge thereof, who fails or refuses to allow the inspection of said book, or who wilfully hinders, obstructs or prevents such officer or officers from making said inspection or from examining said property as provided in the proceeding section, or wilfully violates any other provision of this act, shall be punished by fine not exceeding two hundred dollars or by imprisonment not exceeding one year, or by both such fine and imprisonment.

SECTION 5. If it shall appear to any of the officers mentioned in section three of this act that any articles pledged to any person as herein provided have been stolen, such officer may give to such person a notice in writing to ... after be held by such person for sixty days (unless said notice shall be recalled in writing by the officer giving the same), subject to inspection and examination at all reasonable times; and the same shall be produced upon notice or summons by the district-attorney or other prosecuting officer before any grand jury or court of justice, when the question of the larceny of the same is under legal investigation, and said person shall not be held liable in damages or otherwise to any one for or on account of such detention.

---

## 372   1890.—CHAPTER 419.

SECTION 6. All contracts made by any department of the city of Boston shall, when the amount involved is two thousand dollars or more, be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor in writing is affixed thereto. All such contracts shall be accompanied by a suitable bond or deposit of money or other security for the faithful performance of such contracts, said such bonds or other security shall be deposited with the city auditor until the contract has been carried out in all respects; said no such contract shall be altered except by a written agreement of the contractor, the sureties on his or their bond, and the officer or board making the contract, with the approval of the mayor affixed thereto.

SECTION 7. The treasurer of said city, when authorized to issue any bonds or certificate of indebtedness of said city, except for a loan in anticipation of taxes for the year in which the loan is made shall, unless the commissioners of the sinking funds or persons having charge of any trust funds of said city purchase the same, invite proposals for the purchase thereof by advertisement in four daily newspapers published in said city, reserving to himself the right to reject any and all bids; in case no such proposal is accepted, the treasurer may, with the approval of the mayor, award or give any part of the loan, or the entire loan in parts to any other person or party, provided only it be at a price or sum not less than par. The rule of interest on such certificate of indebtedness for a loan in anticipation of taxes shall be fixed by said treasurer.

SECTION 8. Section five of chapter two hundred and sixty-six of the acts of the year eighteen hundred and eighty-five is hereby repealed.

SECTION 9. This act shall take effect upon its passage.   Approved June 16, 1890.

Chap.419  AN ACT TO CONFIRM THE PROCEEDINGS OF CERTAIN TOWN MEETINGS.

Be it enacted, etc., as follows:

SECTION 1. The proceedings of town meetings of the several towns heretofore held shall not be invalid for the reason that the tellers appointed at said meetings were sworn by the moderators instead of being sworn by the town clerks.

# ACTS

### AND

# RESOLVES

###### PASSED BY THE

# General Court of Massachusetts

###### IN THE YEAR

# 1939

###### TOGETHER WITH

## TABLES SHOWING CHANGES IN THE STATUTES, ETC.

###### PUBLISHED BY THE

### SECRETARY OF THE COMMONWEALTH



**BOSTON**
**WRIGHT & POTTER PRINTING COMPANY**
1939

A8

128    ACTS, 1939. — CHAP. 156.

Chap.156   AN ACT RELATING TO CONTRACTS ENTERED INTO ON BEHALF OF THE COUNTY OF SUFFOLK.

*Be it enacted, etc., as follows:*

SECTION 1. Chapter four hundred and eighty-six of the acts of thirteen hundred and nine is hereby amended by striking out section thirty and inserting in place thereof the following:— *Section 30.* Every officer or board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of said city, when authorized to erect a new building, or to make structural changes in an existing building, shall make contracts therefor, not exceeding five, each contract to be subject to the approval of the mayor, and when about to do any work or to make any purchase, the estimated cost of which alone, or in conjunction with other similar work or purchase which might properly be included in the same contract, amounts to or exceeds one thousand dollars, shall, unless the mayor gives written authority to do otherwise, invite proposals therefor by advertisement in the City Record. Such advertisements shall state the time and place for opening the proposals in answer to said advertisement, and shall reserve the right to the officer, board or official to reject any or all proposals. No authority to dispense with advertising shall be given by the mayor unless the said officer, board or official furnishes him with a signed statement which shall be published in the City Record giving in detail the reasons for not inviting bids by advertisement.

SECTION 2. Chapter four hundred and eighteen of the acts of eighteen hundred and ninety is hereby amended by striking out section six and inserting in place thereof the following:— *Section 6.* All contracts made by any department of the city of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of the city of Boston, shall, when the amount involved is two thousand dollars or more, be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor is affixed thereto. All such contracts shall be accompanied by a suitable bond or deposit of money or other security for the faithful performance of such contracts, and such bonds or other security shall be deposited with the city auditor until the contract has been carried out in all respects; and no such contract shall be altered except by a written agreement of the contractor, the sureties on his or their bond, and the officer, board or official making the contract, with the approval of the mayor affixed thereto.

SECTION 3. This act shall take effect upon its passage.
*Approved April 26, 1939.*

---

ACTS, 1939. — CHAP. 157.    129

AN ACT RELATIVE TO THE RECORDS OF THE COURTS AND THE   Chap.157
DISPOSAL OF SUCH OF THEIR PAPERS AS ARE OBSOLETE
AND USELESS.

*Be it enacted, etc., as follows:*

SECTION 1. Section thirteen of chapter two hundred and eighteen of the General Laws, as amended by chapter fifty-nine of the acts of nineteen hundred and thirty-seven, is hereby further amended by striking out the first paragraph. *[G.L. (Ter. Ed.), 218, § 13, etc., amended.]*

SECTION 2. Chapter two hundred and twenty-one of the General Laws is hereby amended by striking out section twenty-seven, as appearing in the Tercentenary Edition, and inserting in place thereof the following:— *Section 27.* The supreme judicial court shall by rule or order direct in what manner and to what extent, if any, the papers in causes which are entered in any court of the commonwealth shall be extended upon the records, after final judgment or otherwise, and what shall be a final record. Such rule or order shall specify whether such extension shall be in whole or in part, shall be in long hand, typewriting, print or otherwise, or shall consist of the filing of original papers in such causes by loose leaf system or otherwise. *[G.L. (Ter. Ed.), 221, § 27, amended. Extension of records in courts.]*

SECTION 3. Said chapter two hundred and twenty-one is hereby further amended by inserting after section twenty-seven, as amended by section two of this act, the following new section:— *Section 27A.* The supreme judicial court may by rule or order provide for the disposal by destruction or otherwise of obsolete and useless papers in causes which have been entered in any court of the commonwealth and of obsolete and useless notes of testimony that have been preserved in any such court, but subject, except with respect to such papers, to the following requirements:— *[G.L. (Ter. Ed.), 221, new § 27A, inserted. Rules relative to destruction of obsolete papers.]*

(1) The cause to which the papers relate shall have been finally disposed of for more than twenty years.

(2) No original paper bearing date or known to have been filed earlier than the year eighteen hundred shall be destroyed.

(3) Reasonable notice to the public shall be given before any such disposal is made of any paper.

Any rule or order under authority of this section may provide for the method of proof in other causes of the contents of papers disposed of hereunder, and shall govern such proof, notwithstanding any statutory provision requiring any different method of proof.

SECTION 4. This act shall take effect upon its passage, except that section one shall take effect with respect to any district court upon the effective date of a rule or order adopted or made by the supreme judicial court under authority of section three, providing for the disposal of obsolete and useless papers in causes entered in such district court. *[Effective date.]*
*Approved April 26, 1939.*

A9

*30A.* Whoever removes stones, gravel, sand or other mate- *Penalty for removing barriers to erosion by the sea.* rial from any natural barrier on land bordering on the sea, which barrier furnishes protection to such land and adjacent upland against erosion by the sea shall be punished by a fine of not more than five hundred dollars.

The superior court shall have jurisdiction in equity to enforce the provisions of this section. A petition for such enforcement may be filed by the attorney general, the selectmen of the town or the mayor of a city in which such barrier is located, or any person who may suffer damage in his property by such removal. *Approved March 15, 1950.*

---

An Act authorizing the installation, maintenance *Chap.*215 and operation of automatic signals at grade cross- ings in the town of Adams.

*Be it enacted, etc., as follows:*

The department of public utilities is hereby authorized to order the Boston and Albany Railroad to install, main- tain and operate automatic signals at the grade crossing located at Harmony street in the town of Adams and at the grade crossing located at School and Hoosac streets in said town. The cost of installing, maintaining and operat- ing said automatic signals shall be borne by said Boston and Albany Railroad. *Approved March 15, 1950.*

---

An Act relative to certain contracts entered into *Chap.*216 on behalf of the city of Boston and the county of Suffolk.

*Be it enacted, etc., as follows:*

Section 1. Section 6 of chapter 418 of the acts of 1890, as amended by section 2 of chapter 156 of the acts of 1939, is hereby further amended by striking out the first sentence and inserting in place thereof the following sentence: — All contracts made by any department of the city of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of the city of Boston, shall, when the amount involved is one thousand dollars or more or when the contract comes within section thirty of chapter four hundred and eighty-six of the acts of nineteen hundred and nine, as amended, be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without an appropriation.

Section 2. This act shall take effect on July first, nine- teen hundred and fifty. *Approved March 15, 1950.*

A 10

the date his retirement allowance became effective, the retirement allowance to which he would have been entitled under the provisions of paragraph (a) of subdivision (2) of section five of said chapter thirty-two, as amended by section one of chapter seven hundred and eighty-three of the acts of nineteen hundred and fifty-one, if said payment had been received by the teachers' retirement board prior to his termination of service.         *Approved May 31, 1952.*

An Act relating to the disposition of certain property now used for water supply purposes in or adjacent to the town of Lincoln.        *Chap.375*

*Be it enacted, etc., as follows:*

Section 1. In the event that the city of Cambridge or any officer or board acting under its authority, shall determine to sell, lease, abandon, or otherwise dispose of its property or rights or any portion thereof lying in or adjacent to the town of Lincoln, and included in the water basin commonly called the Hobbs Brook reservoir, or in any stream or tributary connected with said reservoir, and lying in or adjacent to said town, or shall be authorized or directed by the commonwealth so to do, no such sale, lease, abandonment, or other disposition shall become effective until said town of Lincoln, through its board of selectmen and its board of water commissioners, shall have been notified by registered mail of such intended disposition, and until said property lying in or adjacent to said town of Lincoln shall have been offered to said town for purchase, lease or acquisition for water supply or other municipal purposes. Such notice of intention and offer shall be made by the city of Cambridge as above provided not less than one year prior to the date when such intended sale, lease, abandonment or other disposition is planned to become effective. In case any such transaction is proposed to be carried out by authority of or by direction of the commonwealth or of any board or commissioner acting under it, notice of intention as above provided shall be issued in the same manner by the secretary of the commonwealth.

Section 2. This act shall take effect upon its passage.
        *Approved May 31, 1952.*

An Act exempting certain contracts entered into on behalf of the city of Boston and the county of Suffolk from the requirements of certain provisions of law.        *Chap.376*

*Be it enacted, etc., as follows:*

Section 1. Section 6 of chapter 418 of the acts of 1890, as most recently amended by section 1 of chapter 216 of the acts of 1950, is hereby further amended by striking out the first sentence and inserting in place thereof the following sentence: — All contracts made by any department of the city

*All*

Case 1:05-cv-10921-RGS    Document 35-3    Filed 02/15/2008    Page 13 of 25

of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of the city of Boston, shall, when the amount involved is twenty-five hundred dollars or more, or when the contract comes within section thirty of chapter four hundred and eighty-six of the acts of nineteen hundred and nine, as amended, be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without an appropriation.

SECTION 2. Section 30 of chapter 486 of the acts of 1909, as amended by section 1 of chapter 156 of the acts of 1939, is hereby further amended by striking out the first sentence and inserting in place thereof the following sentence: — Every officer or board in charge of a department in said city and every officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of said city, when authorized to erect a new building or to make structural changes in an existing building, shall make contracts therefor, not exceeding five, each contract to be subject to the approval of the mayor; and when about to do any work or to make any purchase, the estimated cost of which alone, or in conjunction with other similar work or purchase which might properly be included in the same contract, amounts to or exceeds twenty-five hundred dollars, shall, unless the mayor gives written authority to do otherwise, invite proposals therefor by advertisements in the City Record.

SECTION 3. This act shall take full effect upon its acceptance during the current year by vote of the city council of the city of Boston, subject to the provisions of its charter, but not otherwise.    *Approved May 31, 1952.*

---

*Chap.*377 AN ACT RELATIVE TO THE REGISTRATION OF CERTAIN FARM MOTOR VEHICLES.

*Be it enacted, etc., as follows:*

G. L. (Ter. Ed.), 90, § 5, etc., amended.

Registration of certain motor vehicles under general distinguishing mark or number assigned to owner.

SECTION 1. Chapter 90 of the General Laws is hereby amended by striking out section 5, as amended by section 2 of chapter 736 of the acts of 1951, and inserting in place thereof the following section: — *Section 5.* Every manufacturer, dealer, repairman, owner-repairman, transporter and farmer, instead of registering each motor vehicle or trailer owned or controlled by him, may make application for a general distinguishing number or mark, and the registrar, if satisfied of the facts stated in the application, may issue to the applicant a certificate of registration containing the name and business address of the applicant and the gen-

A 12

**36**                           Acts, 1955. — Chap. 60.

such sums as may be necessary, not exceeding in the aggregate four hundred thousand dollars, and may issue bonds or notes therefor which shall bear on their face the words, City of Malden, Public Parking Loan, Act of 1954.

*Approved February 10, 1955.*

*Chap.* 60 An Act concerning certain contracts entered into on behalf of the city of Boston and the county of Suffolk.

*Be it enacted, etc., as follows:*

Section 1. Section 6 of chapter 418 of the acts of 1890, as most recently amended by section 1 of chapter 376 of the acts of 1952, is hereby further amended by striking out the first sentence and inserting in place thereof the following sentence: — All contracts made by any department of the city of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of the city of Boston, shall, when the amount involved is two thousand dollars or more, or when the contract comes within section thirty of chapter four hundred and eighty-six of the acts of nineteen hundred and nine, as amended, be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without an appropriation.

Section 2. Section 30 of chapter 486 of the acts of 1909, as amended by section 2 of chapter 376 of the acts of 1952, is hereby further amended by striking out the first sentence and inserting in place thereof the following sentence: — Every officer or board in charge of a department in said city and every officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of said city, when authorized to erect a new building or to make structural changes in an existing building, shall make contracts therefor, not exceeding five, each contract to be subject to the approval of the mayor; and when about to do any work or to make any purchase, the estimated cost of which alone, or in conjunction with other similar work or purchase which might properly be included in the same contract, amounts to or exceeds two thousand dollars, shall, unless the mayor gives written authority to do otherwise, invite proposals therefor by advertisements in the City Record.

Section 3. This act shall take full effect upon its acceptance by vote of the city council of the city of Boston, subject to the provisions of its charter, but not otherwise.

*Approved February 10, 1955.*

*A* 13

**Chap. 199.** AN ACT MAKING CERTAIN CORRECTIVE CHANGES TO FACILITATE PARTICIPATION IN THE COMMONWEALTH'S PROGRAM OF COLLECTIVE PURCHASES BY POLITICAL SUBDIVISIONS.

*Be it enacted, etc., as follows:*

SECTION 1. Section 4B of chapter 40 of the General Laws is hereby amended by inserting after the second paragraph, added by section 1 of chapter 61 of the acts of 1972, the following paragraph:—

The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

SECTION 2. Section 28 of chapter 43 of the General Laws is hereby amended by inserting after the second paragraph, inserted by section 2 of said chapter 61, the following paragraph:—

The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

SECTION 3. Section 29 of said chapter 43, as most recently amended by chapter 191 of the acts of 1973, is hereby further amended by adding the following paragraph:—

The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

*Approved May 8, 1974.*

**Chap. 200.** AN ACT RELATIVE TO INFORMATION REQUIRED OF A VOTER SIGNING A NOMINATION PAPER.

*Be it enacted, etc., as follows:*

SECTION 1. Section 7 of chapter 53 of the General Laws is hereby amended by striking out the first sentence, as most recently amended by section 1 of chapter 512 of the acts of 1971, and inserting in place thereof the following sentence:—Every voter signing a nomination paper shall sign in person, as registered or substantially as registered, and shall state his residence on January the first preceding, or his residence when registered if subsequent thereto, and the place where he is then living, if different with the street and

---

designated "fiduciary for safekeeping accounts" in the name of such bank, trust company, or private banker, to which account other securities may be credited. Ownership of and other interests in such securities may be transferred by bookkeeping entry on the books of such federal reserve banks without actual issue or physical delivery of such securities. The records of any bank or trust company, acting in the capacities described, or of any individual fiduciary, shall at all times show the name of the party for whose account the securities are so deposited. Any bank or trust company or any other fiduciary which has deposited securities with a federal reserve bank, shall on demand by any court, fiduciary, co-fiduciary, beneficiary or other interested party to an accounting, or by the attorney for any such fiduciary, co-fiduciary, beneficiary or other interested party or association or corporation as such fiduciary, certify in writing that the securities are held by such accounting, certify in writing that the securities are held by such harmless any interested party, or fiduciary or guardian representing such party for loss arising from reliance upon such certification.

*Approved May 8, 1974.*

**Chap. 197.** AN ACT PROVIDING THAT VOTERS MAY DESIGNATE THE PLACES TO WHICH THEIR ABSENT VOTING BALLOTS SHALL BE MAILED.

*Be it enacted, etc., as follows:*

Section 89 of chapter 54 of the General Laws, as most recently amended by chapter 60 of the acts of 1969, is hereby further amended by striking out the third sentence and inserting in place thereof the following sentence:— In the case of a voter who on the date of the election will be absent from the city or town where he is registered, such ballot shall be mailed to any municipality such voter so designates.

*Approved May 8, 1974.*

**Chap. 198.** AN ACT INCREASING THE AMOUNT OF CERTAIN DEATH BENEFITS WHICH MAY BE PAID BY THE QUINCY POLICE MUTUAL AID ASSOCIATION.

*Be it enacted, etc., as follows:*

SECTION 1. The Quincy Police Mutual Aid Association, a corporation duly established under the laws of the commonwealth, is hereby authorized, upon the death of the wife of any member in good standing, to pay such member such sum, not exceeding one thousand dollars, as may from time to time be determined by vote of said corporation, and, upon the death of any member in good standing, to pay such death benefits, not exceeding four thousand five hundred dollars as may from time to time be determined by vote as aforesaid.

SECTION 2. Chapter eighty-four of the acts of nineteen hundred and sixty-two is hereby repealed.

*Approved May 8, 1974.*

A 14

# ACTS

### AND

# RESOLVES

PASSED BY THE
**General Court of Massachusetts**
IN THE YEAR

# 1998

**VOLUME II**

PUBLISHED BY
**William Francis Galvin**
SECRETARY OF THE COMMONWEALTH



Chapter 262. AN ACT RELATIVE TO CERTAIN CONTRACTING PROCEDURES IN THE CITY OF BOSTON.

*Be it enacted, etc., as follows:*

SECTION 1: Section 6 of chapter 418 of the acts of 1890 is hereby amended by striking out the first sentence, as most recently amended by section 1 of chapter 373 of the acts of 1992, and inserting in place thereof the following sentence:- All contracts made by any department of the city of Boston or by any officer, board or official of the county of Suffolk having power to incur obligations on behalf of said county in cases where said obligations are to be paid for wholly from the treasury of said city, shall, when the amount involved is $10,000 or more, or when the contract comes within section 30 of chapter 486 of the acts of 1909, be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the auditor of said city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without an appropriation.

SECTION 2. Section 24 of chapter 486 of the acts of 1909 is hereby repealed.

SECTION 3. This act shall take effect upon its passage.

Approved August 10, 1998.

Chapter 263. AN ACT AUTHORIZING FRANKLIN REGIONAL COUNCIL OF GOVERNMENTS TO CONVEY CERTAIN LAND IN THE TOWN OF WHATELY.

*Whereas,* The deferred operation of this act would tend to defeat its purpose, which is forthwith to immediately authorize the conveyance of certain land, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Be it enacted, etc., as follows:*

SECTION 1. The Franklin Regional Council of Governments may convey a certain parcel of land located in the town of Whately, presently used for open space and recreational purposes, to the town of Whately, for nominal consideration, to be used for recreational purposes. Said parcel is shown as parcel 1 on a plan of land entitled "Plan of Land in Whately (Franklin Co.) MA" prepared by C.T. Male Associates, P. C., of Greenfield, Massachusetts which is on file in the offices of said Franklin Regional Council of Governments. The precise configuration of said parcel may be established by a subsequent land survey. Said Franklin Regional Council of Governments may release for nominal consideration, any other property interests it holds in the property to be conveyed to the town of Whately hereunder.

SECTION 2. The Franklin Regional Council of Governments may convey two parcels of land located in the town of Whately, presently used for open space and recreational

1138

Chap. 263

purposes, to the commonwealth, for nominal consideration to be used for recreational purposes. Said conveyance shall include a right of way for access to said parcels. Said Franklin Regional Council of Governments are hereby further authorized to release, for nominal consideration, any other property interests it holds in the property to be conveyed to the commonwealth of Massachusetts hereunder. Said land shall be placed under the care and control of the department of environmental management. Said parcels are shown as parcels 2 and 3 on the plan of land described in section 1.

SECTION 3. Notwithstanding the provisions of subsection (f) of section 567 of chapter 151 of the acts of 1996 or any other general or special law to the contrary, the town of Whately may release, for nominal consideration, any leasehold or other property interests it holds in the property to be conveyed to the commonwealth hereunder.

Approved August 10, 1998.

Chapter 264. AN ACT PROVIDING FOR AN INCREASE IN THE REQUIREMENTS FOR NOMINATION AS A CANDIDATE FOR ELECTIVE OFFICE IN THE CITY OF MALDEN.

*Be it enacted, etc., as follows:*

SECTION 1. Chapter 169 of the acts of 1881 is hereby amended by striking out section 4 and inserting in place thereof the following section:-

Section 4. All candidates for election to municipal office shall be nominated in accordance with the requirements of chapter 53 of the General Laws; provided, however, nomination papers of candidates for the office of ward councillor shall be signed in the aggregate by not less than 50 voters qualified to vote in said ward in the next municipal election; provided, further, nomination papers for candidates for mayor, school committee and councillor-at-large shall be signed in the aggregate by not less than 200 persons qualified to vote in the next municipal election.

SECTION 2. Section 2 of chapter 550 of the acts of 1955 is hereby repealed.

SECTION 3. This act shall be submitted to the voters of the city of Malden at the regular municipal election to be held in the year 1999 in the form of the following question which shall be placed on the official ballot to be used for the election of city officers at said election "Shall an act passed by the general court in the year 1998 entitled, 'An Act providing for an increase in the requirements for nomination as a candidate for elective office in the city of Malden', be accepted?"

If a majority of the votes cast in answer to said question is in the affirmative, this act shall take effect, but not otherwise.

Approved August 10, 1998.

1139

A 16

Westlaw.

Page 1

M.G.L.A. 43 § 29

C

**Effective: [See Text Amendments]**

MASSACHUSETTS GENERAL LAWS ANNOTATED
PART I. **ADMINISTRATION OF THE GOVERNMENT** (CH. 1-182)
TITLE VII. **CITIES, TOWNS AND DISTRICTS** (CH. 39-49A)
CHAPTER 43. **CITY CHARTERS**
GENERAL PROVISIONS
→§ 29. Public contracts; form; required approvals; bond, etc.

All contracts made by any department, board or commission where the amount involved is five thousand dollars or more shall be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor under Plan A, B, C or F, or of the city manager under Plan D or E, and also of the officer or the head of the department or of the chairman of the board, as the case may be, making the contract is affixed thereto. Any contract made as aforesaid may be required to be accompanied by a bond with sureties satisfactory to the board or official having the matter in charge, or by a deposit of money, certified check or other security for the faithful performance thereof, and such bonds or other securities shall be deposited with the city treasurer until the contract has been carried out in all respects; and no such contract shall be altered except by a written agreement of the contractor, the sureties on his bond, if any, and the officer, department or board, as the case may be, making the contract, with the approval of the mayor under Plan A, B, C, D or F, or of the city manager under Plan E, affixed thereto. Any cash deposit or check payable to a city received as security for performance under this section may be deposited by said treasurer in any bank or trust company under a separate account to be known as a performance deposit account.

The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

Current through Chapter 24 of the 2008 2nd Annual Sess.

© 2008 Thomson/West

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

$A\,17$

if both day and evening classes are established the day classes shall be open only to women over sixteen years of age, and the evening classes shall be open only to women over seventeen years of age who are employed in any capacity during the day. Such classes may be established and maintained as approved state-aided practical art classes under the provisions of, and subject to all the conditions, not inconsistent with this act, of chapter four hundred and seventy-one of the acts of the year nineteen hundred and eleven.

SECTION 2.  This act shall take effect upon its passage.

*Approved May 20, 1915.*

---

*Chap.*267 AN ACT TO SIMPLIFY THE REVISION OF CITY CHARTERS.

*Be it enacted, etc., as follows:*

### PART I.

SECTION 1.  The following words and phrases as used in this act shall, unless a contrary intention clearly appears, have the following meanings, respectively: —

The phrase "regular municipal election" shall mean the annual election of municipal officers for which provision is made in this act.

The words "officer", "officers" and "administrative officers", when used without further qualification or description, shall mean any person or persons in charge of any department or division of the city. The said words when used in contrast with a board or members of a board, or with division heads, shall mean any of the persons in sole charge of a department of the city.

The word "ordinance" shall mean a vote or order of the mayor and city council entitled "ordinance" and designed for the permanent regulation of any matter within the jurisdiction of the mayor and city council as laid down in this act.

The term "registered voter" shall mean a voter qualified to vote for elective officers within whose rights and powers the proposed measure would fall under this act.

"Plan A" shall mean a city government and legislative body composed of the mayor and a city council, the councillors being elected at large.

"Plan B" shall mean a city government and legislative body composed of a mayor and city council, the council-

*A 18*

GENERAL ACTS, 1915. — CHAP. 267. — PART I.

on behalf of the city, the contract may be signed by any
other officer of the city duly authorized thereto by the
mayor, or if the mayor has such interest, by the city clerk:
*Proviso.*  *provided, however,* that when a contractor with the city
is a corporation or a voluntary stock association, the owner-
ship of less than five per cent of the stock or shares actually
issued shall not be considered as involving an interest in
the contract within the meaning of this section, and such
ownership shall not affect the validity of the contract unless
the owner of such stock or shares is also an officer or agent
of the corporation or association, or solicits or takes part
in the making of the contract.

*Penalty.*  A violation of any provision of this section shall render
the contract in respect to which such violation occurs void-
able at the option of the city. Any person violating the
provisions of this section shall be punished by a fine of not
more than one thousand dollars, or by imprisonment for
not more than one year, or by both such fine and imprison-
ment.

*Proposals to be asked for certain contracts.*  SECTION 28. No contract for construction work or for
the purchase of apparatus, supplies or materials, whether the
same shall be for repairs or original construction, the esti-
mated cost of which amounts to or exceeds two hundred
dollars, except in cases of special emergency involving the
health or safety of the people or their property, shall be
awarded unless proposals for the same shall have been invited
by advertisements in at least one newspaper published in
the city once a week for at least two consecutive weeks,
the last publication to be at least one week before the time
specified for the opening of said proposals. Such advertise-
*Advertisements, terms, etc.*  ments shall state the time and place where plans and speci-
fications of proposed work or supplies may be had and the
time and place for opening the proposals in answer to said
advertisements, and shall reserve to the city the right to
reject any or all of such proposals. All such proposals
shall be opened in public. No bill or contract shall be
split or divided for the purpose of evading any provision
of this act.

*Mayor to approve certain contracts.*  SECTION 29. All contracts made by any department,
board or commission in which the amount involved is two
hundred dollars or more shall be in writing, and no such
contract shall be deemed to have been made or executed
until the approval of the mayor and of the department or
board making the contract is affixed thereto. Any contract

A 19

Case 1:05-cv-10921-RGS    Document 35    Filed 02/15/2008    P    56 of 60

GENERAL ACTS, 1915. — CHAP. 267. — PART I.          299

made as aforesaid may be required to be accompanied by **Surety bond, etc.**
a bond with sureties satisfactory to the board or official
having the matter in charge, or by a deposit of money,
certified check or other security for the faithful performance
thereof, and such bonds or other securities shall be deposited
with the city treasurer until the contract has been carried
out in all respects; and no such contract shall be altered
except by a written agreement of the contractor, the sureties
on his bond, and the officer, department or board making
the contract, with the approval of the mayor affixed thereto.

SECTION 30. At the request of any department, and with **Taking of land for municipal purposes.**
the approval of the mayor and the city council, the city
council or corresponding body may take in fee, in the name
of the city, for any municipal purpose any land within the
limits of the city not already appropriated to public use.
Whenever the price proposed to be paid for a lot of land **By right of eminent domain.**
for any municipal purpose is more than twenty-five per
cent higher than its average assessed valuation during the
previous three years, the land shall not be taken by pur-
chase, but shall be taken by right of eminent domain and
paid for in the manner provided for the taking of, and the
payment of damages for, land taken for highways in the
city concerned. No land shall be taken until an appro-
priation by loan or otherwise for the general purpose for
which land is needed shall have been made by the mayor
and city council, or corresponding body, by a two thirds
vote of all its members; nor shall a price be paid in excess
of the appropriation, unless a larger sum is awarded by a
court of competent jurisdiction. All proceedings in the **Record to be kept.**
taking of land shall be under the advice of the law depart-
ment, and a record thereof shall be kept by that depart-
ment.

SECTION 31. The school committee shall consist of the **School committee, number, term, etc.**
mayor, who shall be the chairman, and six members who
shall be elected at large. At the first annual city election
held in any city after its adoption of one of the plans of
government provided for in this act, there shall be elected
two members to serve for one year, two for two years and
two for three years, and annually thereafter there shall be
elected two members to serve for the term of three years.

SECTION 32. The school committee shall elect annually **To appoint superintendent, etc.**
a superintendent of schools, and may, under the laws regu-
lating the civil service, appoint, suspend or remove at
pleasure such subordinate officers or assistants, including

A20

## 334    ACTS, 1928. — CHAPS. 299, 300.

Supreme judi-
cial court may
review, etc.,
rulings or
orders of
trustees.

SECTION 12. The supreme judicial court shall have juris-
diction in equity to review and alter, modify, amend or en-
force rulings or orders of the trustees to the same extent that
such jurisdiction is given to said court over rulings and orders
of the department by any existing law.

Commonwealth
may take
property of
company, etc.

SECTION 13. Nothing in this act contained shall prevent
the commonwealth from taking the whole or any part of the
property of the company under the power of eminent do-
main.

Time of
taking effect,
etc.

SECTION 14. This act shall take effect as of January
fifteenth, nineteen hundred and twenty-nine, except for the
purpose of its acceptance as hereinafter provided and for the
purpose of appointing trustees hereunder, upon its accept-
ance by the company given by a vote of the holders of not
less than a majority of all the stock of the company at a
meeting held for the purpose, a copy of which vote, certified
by the clerk of the company, shall be filed with the state

Proviso.

secretary; provided, however, that this act shall become
void unless such a certified copy of said vote of acceptance
shall so be filed on or before November first, nineteen hun-
dred and twenty-eight.    *Approved May 7, 1928.*

*Chap.*299 AN ACT RELATIVE TO THE PAYMENT BY THE TOWN OF WEY-
MOUTH OF DAMAGES CONSEQUENT UPON THE WIDENING
OF BRIDGE STREET IN SAID TOWN.

*Be it enacted, etc., as follows:*

Town of
Weymouth
may make
agreements for
payment of
damages con-
sequent upon
widening of
Bridge street.

SECTION 1. The board of selectmen of the town of
Weymouth, in any case where in its opinion justice and
equity so require, may, within six months after the passage
of this act, make such agreements for the payment of sums as
damages consequent upon the widening of Bridge street, a
state highway in said town, in the year nineteen hundred and
twenty-six, in addition to the sums heretofore awarded, if
any, as in its judgment the facts in such case may warrant,
and said town may appropriate and raise money for the
payment of said sums so agreed upon.

SECTION 2. This act shall take effect upon its passage.
*Approved May 8, 1928.*

*Chap.*300 AN ACT RELATIVE TO CERTAIN CONTRACTS OF CITIES HAVING
STANDARD FORM CHARTERS, SO-CALLED.

*Be it enacted, etc., as follows:*

G. L. 43, § 28,
amended.

SECTION 1. Section twenty-eight of chapter forty-three
of the General Laws is hereby amended by striking out, in
the third line, the word "two" and inserting in place thereof

Proposals to be
asked for cer-
tain contracts,
etc.

the word: — five, — so as to read as follows: — *Section 28.*
No contract for construction work or for the purchase of
apparatus, supplies or materials, whether for repairs or
original construction, the estimated cost of which amounts
to five hundred dollars or more, except in cases of special
emergency involving the health or safety of the people or

421

their property, shall be awarded unless proposals for the same have been invited by advertisements in at least one newspaper published in the city once a week for at least two consecutive weeks, the last publication to be at least one week before the time specified for the opening of said proposals. Such advertisements shall state the time and place where plans and specifications of proposed work or supplies may be had and the time and place for opening the proposals in answer to said advertisements, and shall reserve to the city the right to reject any or all of such proposals. All such proposals shall be opened in public. No bill or contract shall be split or divided for the purpose of evading any provision of this chapter. *To be opened in public, etc.*

SECTION 2. Section twenty-nine of said chapter forty-three is hereby amended by striking out, in the second line, the word "two" and inserting in place thereof the word: — five, — so as to read as follows: — *Section 29.* All contracts made by any department, board or commission where the amount involved is five hundred dollars or more shall be in writing, and no such contract shall be deemed to have been made or executed until the approval of the mayor and of the department or board making the contract is affixed thereto. Any contract made as aforesaid may be required to be accompanied by a bond with sureties satisfactory to the board or official having the matter in charge, or by a deposit of money, certified check or other security for the faithful performance thereof, and such bonds or other securities shall be deposited with the city treasurer until the contract has been carried out in all respects; and no such contract shall be altered except by a written agreement of the contractor, the sureties on his bond, and the officer, department or board making the contract, with the approval of the mayor affixed thereto. *G. L. 43, § 29, amended.* *Mayor to approve certain contracts.* *Surety bond, etc.*

SECTION 3. This act shall become operative on January first, nineteen hundred and twenty-nine. *When operative.*

*Approved May 8, 1928.*

AN ACT ENLARGING THE DISTRICT TO WHICH CERTAIN LAWS RELATIVE TO THE EMISSION OF SMOKE SHALL APPLY, AND PROVIDING FOR FURTHER INVESTIGATION RELATIVE TO THE EMISSION OF SMOKE IN SUCH DISTRICT. *Chap. 301*

*Be it enacted, etc., as follows:*

SECTION 1. Section one of chapter six hundred and fifty-one of the acts of nineteen hundred and ten, as amended by section one of chapter ten of the acts of nineteen hundred and eleven, is hereby further amended by striking out the third paragraph and inserting in place thereof the following: — *1910, 651, § 1, etc., amended.*

"District" means the district to which the provisions of this act shall apply, to wit: — That part of Boston harbor lying westerly of a line drawn from the southeastern point of Deer Island to the northeastern point of Long Island and *"District" defined.*

*A22*

106     ACTS, 1974. — CHAPS. 197, 198.

designated "fiduciary for safekeeping accounts" in the name of such bank, trust company, or private banker, to which account other securities may be credited. Ownership of and other interests in such securities may be transferred by bookkeeping entry on the books of such federal reserve banks without actual issue or physical delivery of such securities. The records of any bank or trust company, acting in the capacities described, or of any individual fiduciary, shall at all times show the name of the party for whose account the securities are so deposited. Any bank or trust company or any other fiduciary which has deposited securities with a federal reserve bank, shall on demand by any court, fiduciary, co-fiduciary, beneficiary or other interested party to an accounting, or by the attorney for any such fiduciary, co-fiduciary, beneficiary or other interested party to an accounting, certify in writing that the securities are held by such association or corporation as such fiduciary, and shall therein hold harmless any interested party, or fiduciary or guardian representing such party for loss arising from reliance upon such certification.

*Approved May 8, 1974.*

**Chap. 197.**  AN ACT PROVIDING THAT VOTERS MAY DESIG-
NATE THE PLACES TO WHICH THEIR ABSENT
VOTING BALLOTS SHALL BE MAILED.

*Be it enacted, etc., as follows:*

Section 89 of chapter 54 of the General Laws, as most recently amended by chapter 60 of the acts of 1969, is hereby further amended by striking out the third sentence and inserting in place thereof the following sentence:— In the case of a voter who on the date of the election will be absent from the city or town where he is registered, such ballot shall be mailed to any municipality such voter so designates.

*Approved May 8, 1974.*

**Chap. 198.**  AN ACT INCREASING THE AMOUNT OF CERTAIN
DEATH BENEFITS WHICH MAY BE PAID BY THE
QUINCY POLICE MUTUAL AID ASSOCIATION.

*Be it enacted, etc., as follows:*

SECTION 1. The Quincy Police Mutual Aid Association, a corporation duly established under the laws of the commonwealth, is hereby authorized, upon the death of the wife of any member in good standing, to pay such member such sum, not exceeding one thousand dollars, as may from time to time be determined by vote of said corporation, and, upon the death of any member in good standing, to pay such death benefits, not exceeding four thousand five hundred dollars as may from time to time be determined by vote as aforesaid.

SECTION 2. Chapter eight-four of the acts of nineteen hundred

---

ACTS, 1974. — CHAPS. 199, 200.     107

**Chap. 199.**  AN ACT MAKING CERTAIN CORRECTIVE
CHANGES TO FACILITATE PARTICIPATION IN
THE COMMONWEALTH'S PROGRAM OF COLLEC-
TIVE PURCHASES BY POLITICAL SUBDIVISIONS.

*Be it enacted, etc., as follows:*

SECTION 1. Section 4B of chapter 40 of the General Laws is hereby amended by inserting after the second paragraph, added by section 1 of chapter 61 of the acts of 1972, the following paragraph:—
The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

SECTION 2. Section 28 of chapter 43 of the General Laws is hereby amended by inserting after the second paragraph, inserted by section 2 of said chapter 61, the following paragraph:—
The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

SECTION 3. Section 29 of said chapter 43, as most recently amended by chapter 191 of the acts of 1973, is hereby further amended by adding the following paragraph:—
The provisions of this section shall be deemed to have been complied with on all purchases made under the provisions of sections twenty-two A and twenty-two B of chapter seven when one municipality acting on behalf of other municipalities complies with the provisions of this section, or when purchases are made from a vendor holding a contract with the commonwealth for the item or items being purchased.

*Approved May 8, 1974.*

**Chap. 200.**  AN ACT RELATIVE TO INFORMATION REQUIRED
OF A VOTER SIGNING A NOMINATION PAPER.

*Be it enacted, etc., as follows:*

SECTION 1. Section 7 of chapter 53 of the General Laws is hereby amended by striking out the first sentence, as most recently amended by section 1 of chapter 512 of the acts of 1971, and inserting in place thereof the following sentence:— Every voter signing a nomination paper shall sign in person, as registered or substantially as registered, and shall state his residence on January the first preceding, if subsequent thereto

ACTS, 1909. — CHAP. 486.

518

forty-nine of the acts of the year eighteen hundred and ninety-five except those in the election department are hereby abolished, and except as aforesaid the said section is hereby repealed.

The civil service laws shall not apply to the appointment of the mayor's secretaries, nor of the stenographers, clerks, telephone operators and messengers connected with his office, and the mayor may remove such appointees without a hearing and without making a statement of the cause for their removal.

SECTION 16. No official of said city, except in case of extreme emergency involving the health or safety of the people or their property, shall expend intentionally in any fiscal year any sum in excess of the appropriations duly made in accordance with law, nor involve the city in any contract for the future payment of money in excess of such appropriation, except as provided in section six of this act. Any official who shall violate the provisions of this section shall be punished by imprisonment for not more than one year, or by a fine of not more than one thousand dollars, or both.

THE FINANCE COMMISSION.

SECTION 17. Within sixty days after the passage of this act the governor with the advice and consent of the council shall appoint a finance commission to consist of five persons, inhabitants of and qualified voters in the city of Boston, who shall have been such for at least three years prior to the date of their appointment, one for the term of five years, one for four years, one for three years, one for two years, and one for one year, and thereafter as the terms of office expire in each year one member for a term of five years. Vacancies in the commission shall be filled for the unexpired term by the governor with the advice and consent of the council. The members of said commission may be removed by the governor with the advice and consent of the council for such cause as he shall deem sufficient. The chairman shall be designated by the governor. His annual salary shall be five thousand dollars, which shall be paid in monthly instalments by the city of Boston. The other members shall serve without pay.

*Margin notes:* Vacation. Expenditures not to exceed appropriations therefor. Civil service laws not to apply to appointments. Penalty.

ACTS, 1909. — CHAP. 486.

519

SECTION 18. It shall be the duty of the finance commission from time to time to investigate any and all matters relating to appropriations, loans, expenditures, accounts, and methods of administration affecting the city of Boston or the county of Suffolk, or any department thereof, that may appear to the commission to require investigation, and to report thereon from time to time to the city council, the mayor, the governor, or the general court. The commission shall make an annual report in January of each year to the general court.

SECTION 19. Whenever any pay roll, bill, or other claim against the city is presented to the mayor, city auditor, or the city treasurer, he shall, if the same seems to him to be of doubtful validity, excessive in amount, or otherwise contrary to the city's interest, refer it to the finance commission, which shall immediately investigate the facts and report thereon; and pending said report payment shall be withheld.

SECTION 20. The said commission is authorized to employ such experts, counsel, and other assistants, and to incur such other expenses as it may deem necessary, and the same shall be paid by said city upon requisition by the commission, not exceeding in the aggregate in any year the sum of twenty-five thousand dollars, or such additional sums as may be appropriated for the purpose by the city council; and approved by the mayor. A sum sufficient to cover the salary of the chairman of the commission and the further sum of at least twenty-five thousand dollars to meet the expenses as aforesaid shall be appropriated each year by said city. The commission shall have the same right to incur expense in anticipation of its appropriation as if it were a regular department of said city.

SECTION 21. For the purpose of enabling the said commission to perform the duties and carry out the objects herein contemplated, and to enable the mayor, the city council, the governor or the general court to receive the reports and findings of said commission as a basis for such laws, ordinances, or administrative orders as may be deemed meet, the commission shall have all the powers and duties enumerated in chapter five hundred and sixty-two of the acts of the year nineteen hundred and eight, and therein conferred upon the commission designated in said act; but counsel for any witness at any public hear-

*Margin notes:* Duties, etc. Pay rolls, bills, etc., to be referred to the commission, etc. Employment of experts, etc. Powers of civil service commission.

A24