# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **INTERNATIONAL SALT CO, LLC**<br><br>**Plaintiff,**<br><br>v.<br><br>**CITY OF BOSTON**<br><br>**Defendants.** | **Docket No:  05-CV-10921-RGS** |

## PLAINTIFF'S POST-TRIAL BRIEF

This action arises out of a dispute between the Plaintiff, International Salt Co.,
LLC ("ISCO") and the Defendant, the City of Boston ('the City") concerning a contract for the
provision of sodium chloride rock salt ("Rock Salt") during the 2004 – 2005 winter season.  In
brief, the City of Boston and ISCO executed an initial contract by which ISCO was obligated to
provide 75,000 tons of Rock Salt to the City.  Due to extraordinarily severe weather conditions
during 2004-2005 winter, the City ultimately required Rock Salt in excess of the contract
amount.

At issue in this matter is a dispute between the parties concerning ISCO's obligations
under the contract and the City's obligations with respect to the 28,000 tons of salt ISCO
delivered to the City in excess of the original contract quantity of 75,000 tons.

At trial, the parties submitted a comprehensive Stipulation of Facts ("Stipulation") and a
set of agreed upon exhibits.  Apart from issues identified later in this memorandum, there was
little disagreement in the oral testimony.

As the record reflects, the crux of this dispute arose in mid-February, 2005 as ISCO neared fulfillment of the 75,000 salt delivery requirements. Foreseeing a need for salt deliveries in excess of that amount, the City sought ISCO's confirmation that it would continue to make salt deliveries in excess of 75,000 tons at the initial contract price of $36.42 per ton. ISCO demurred on the grounds that it had fulfilled its contractual obligation and that increases in ocean shipping costs made it no longer economically feasible to adhere to the original price. The City countered that, under the existing contract, it was entitled to purchase as much salt as it needed in excess of 75,000 tons. Although the contract contained inherent ambiguities with respect to this point, the Court ruled that the City's interpretation of the contract was commercially unreasonable. Hence, the Court made a preliminary finding that the initial contract for 75,000 tons was fully performed once ISCO had fulfilled delivery of that amount.

ISCO offered to continue salt deliveries above 75,000 tons at a price of $42.36 per ton. The City rejected that proposal. Informed of the disagreement, then Commissioner of Public Works, Joseph Casazza, phoned ISCO and demanded that it agree to continue to supply salt to the City when his department needed it. As documented in the Stipulation, the deposition testimony and the trial testimony, salt is a critical element in maintaining public health and safety in the face of winter snow storms. In so many words, Casazza informed ISCO that the City would hold ISCO responsible if public safety were compromised because the City lacked sufficient salt to respond to additional storms.

In the face of Casazza's demands, ISCO agreed to continue to supply the City with Rock Salt under a reservation of its right to seek a higher price from a court in the absence of an agreement on price. That reservation is reflected in the letter from Robert Jones to Commissioner Casazza, dated February 10, 2005, Trial Exhibit 14; Attorney Neil Epstein's letter

on behalf of ISCO, dated February 11, 2005, Trial Exhibit 15; and Robert Jones' further letter to

Purchasing Agent William Hannon, dated February 18, 2005, Trial Exhibit 17. See also

Stipulation ¶¶ 24-30. The parties are before this Court for the very reason that, as set forth in the

referenced correspondence, ISCO continued to deliver salt to the City as it requested in the

absence of agreement over the price.

Thereafter, the City issued three purchase orders for a total of 28,050 tons of salt above

the initial contract quantity. Of this amount, ISCO delivered 27,021.84 tons. In consonance with

its reservation of rights, ISCO supplied the City with Rock Salt in conformity with the original

contract specifications, save for price, the one issue on which the parties were unable (or

unwilling) to agree. In accordance with its reservation of rights, ISCO invoiced the City and the

City paid ISCO for that salt at the original contract rate of $36.42 per ton.

On April 15, 2005, counsel for ISCO sent the City a letter, Trial Exhibit 20, in which

ISCO made demand for payment for the additional 27,021.84 tons of salt in an amount due in

excess of the original contract price based on a fair market price of $56.42 per ton.

Stipulation ¶ 33.

ISCO submits the within memorandum in support of its contention that the Court should

award ISCO damages, plus interest at the statutory contract rate, based on its contentions that:

(1) its agreement to deliver 27,000 tons of Rock Salt, incorporating the terms of the prior

contract, save for the price, is enforceable against the City under both the emergency

procurement provisions of MASS. GENERAL LAWS C. 30B, §8 and principles of equitable estoppel

and (2) that given the open price term of said agreement, reflective of the parties' inability to

agree on price, the Court should supply a reasonable price term reflective of then prevailing

market rates and/or the increase in ocean freight delivery costs which ISCO incurred in meeting the City's additional requirements.

## I.    ISCO'S AGREEMENT TO PROVIDE ADDITIONAL ROCK SALT IS ENFORCEABLE UNDER PRINCIPLES OF BOTH LAW AND EQUITY

ISCO maintains that its agreement to extend the existing contract by continuing to supply the City with salt above the original contract quantity, absent compliance with all of the statutory formalities, is enforceable both under the emergency provisions of M.G.L. c. 30B, §8 and by virtue of the applicability of the principle of equitable estoppel.

### A.    Provision of Rock Salt Beyond the Scope of the Original Contract was Pursuant to the Emergency Provisions of M.G.L. c. 30B

As ISCO has previously stated, to the extent that the City required more than the initially agreed-upon 75,000 tons of Rock Salt during the 2004 – 2005 winter season, the relationship between the parties is governed by the emergency provisions of M.G.L. c. 30B, § 8, and any failure to strictly adhere to standard bidding procedures is thus excusable. The statute expressly authorizes emergency procurement without compliance with statutory requirements whenever the time required for compliance "would endanger the health or safety of the people or their property...." M.G.L. c. 30B, § 8.

On the record, absence of salt enabling the City to respond to a snow storm creates an incontrovertible and substantial risk to public safety. See Stipulation ¶ 12 and referenced deposition testimony. Regarding the critical necessity of salt, Commissioner Casazza testified at his deposition, "I can't imagine fighting a snowstorm without [it]. . .," and went on to state, in so many words, that absent salt, it would be very difficult to get fire apparatus and ambulances to places where their services were needed. See Trial Exhibit 23. For his part, Vincent Caiani, the Assistant Purchasing Agent responsible for the City's salt procurement, testified that a refusal by

ISCO to continue salt deliveries above the initial 75,000 tons would have absolutely created a public safety risk, because, to use his exact words, "if they [ISCO] decided not to deliver, the City – the city of Boston would ultimately run out of salt, and as you've mentioned earlier, we had a very bad winter, so we would have been-- it would have definitely been a public safety issue." Trial Exhibit 24, p. 59.

In light of the climatological record, Trial Exhibits 3 through 8; the fact that, absent ISCO's continued deliveries, the City would have exhausted its salt inventory before winter's end; and, the unequivocal testimony referenced above, to which the City stipulated, it is disingenuous at best for the City to assert, as it attempted to do at trial, that, with the benefit of hindsight, conditions never rose to the level of an emergency sufficient to satisfy the requirements of M.G.L. c. 30(b), §8, which excuses compliance with the usual statutory formalities.

Under the City's normal competitive bidding procedures, four to six weeks would have been required to process a procurement using the statutorily required competitive bid and award procedures. Stipulation ¶ 19. This was further confirmed by the City's trial witnesses. Yet it was already mid-February when, prior to its receipt of the full amount set forth in the initial contract, the City advised ISCO by letter and telephone calls that in light of severe weather conditions and a series of extraordinary snow storms, it would require an amount of Rock Salt in excess of that provided for under the initial contract.

As this Court has determined, to the extent that the City found it needed more Rock Salt, any additional tonnage was clearly outside the scope of the original contract. ISCO acknowledges that under ordinary circumstances, procurement of a new contract or alteration of the original contract, increasing the amount of Rock Salt supplied to the City would typically be

governed by the public bidding and approval provisions of M.G.L. 30B, § 13 and the City Charter.

However, taken as a whole, M.G.L. c. 30B gives the City's purchasing agent the authority to make emergency procurements without following the dictates of competitive bidding. Further, the statute expressly authorizes the purchasing agent to pay more than the original contract price when purchasing "road salt or other ice and snow control supplies" by specifically exempting such supplies from a limit imposed on the increase in total contract price. M.G.L. c. 30B, § 13(4).

As the evidence presented at trial made abundantly clear, whether the City prefers now not to characterize the situation as an emergency *per se* is merely a matter of semantics. At the time that it was requesting additional Rock Salt the City, through its representatives, communicated what was undeniably an urgent need for salt to ISCO. Had ISCO refused to deliver additional salt, the City would have exhausted its salt inventory, and any additional late-season storm would have posed a grave threat to public safety.

Rather than going through the normal channels of communication the situation was so dire that the City enlisted its Commissioner of Public Works to secure ISCO's commitment to continuing to meet the City's continuing salt necessity.

As referenced above, City officials testified, both at trial and throughout their depositions, that salt is of critical importance to public safety in responding to winter storms and that no other substance, such as sand, possesses the melting properties of salt and as such no other substance is as effective.[1]  The Commissioner testified that he did not care about the price,

---

[1] Furthermore, the use of sand to "cut" or extend salt supply poses its own risk to public safety. While sand provides traction in winter weather, because the sand does not dissipate once the snow and ice melt, it remains on the streets and sidewalks causing slippery conditions unless it is removed. In using sand the City also incurs additional costs for removal of approximately $20 per ton of sand.

he just wanted the salt—a sentiment that was adamantly and repeatedly communicated to multiple ISCO representatives at the time.  Based on all of the evidence it is clear that the City believed that a depletion of its salt stores would create significant threats to public health and safety.  The City communicated this sense of urgency to ISCO which in turn, under an express reservation of rights as to the price term, provided the salt despite the parties' inability to agree on a set price.

In light of the emergent nature of the situation and in the absence of any set policy or protocol the City was authorized to make the procurement under the auspices of M.G.L. c. 30B, §8.  The City cannot now take a contrary position and claim that there was no emergency for purposes of avoiding its contract obligation.  Furthermore, the City should be judicially estopped from claiming the absence of an emergency sufficient to invoke the provisions M.G.L. c. 30B, §8 because it is bound by its Interrogatory Answers in which it declined to take a position on the issue.  See the City's Answers to Plaintiff's First Set of Interrogatories, attached hereto as Exhibit A.  In its Answers, the City stated that it "had (and has) no occasion to form a contention as to whether any risk to health or safety to people or property would have been presented" should ISCO have failed to provide the salt.  See Exhibit A, Answer No. 7; See also Vasys v. Metropolitan District Commision, 387 Mass. 51,  57 (1982) (holding that the Metropolitan District Commission could not raise a presentment defense in a Tort Claims action where it had previously averred in its answers to interrogatories that notice was not defective);  Elfman v. Glaser, 313 Mass. 370, 377 (1943)(Holding that a litigant cannot assume inconsistent and contradictory positions); City of Boston v. Nielsen, 305 Mass. 429, 433 (1939) (holding that the City was estopped from taking an inconsistent position relative to the same subject at issue in a

previous trial). The City cannot now contend that there was no risk to public health or safety when it has attested to having no position on the matter.

Thus, there is no legal or statutory bar to the City's exercise of the emergency procurement provisions of M.G.L. c. 30B, §8 as it is foreclosed from asserting that the conditions which justified application of that section did not arise.

**B.    Equitable Estoppel Also Authorizes Enforcement Against the City**

Notwithstanding the statutory basis for enforcement of the agreement between ISCO and the City, there also lies an adequate basis for enforcement in equity by virtue of the principles of estoppel.

Generally, Massachusetts courts are "reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest." Phipps Prod. Corp. v. Massachusetts Bay Transp. Authty., 387 Mass. 687, 693 (1982). However, this reluctance poses no absolute bar, as a matter of law, to application of the principle in appropriate circumstances where, as the Court here observed during trial, countervailing public health and safety considerations are at stake. In fact the First Circuit has explicitly stated that "courts undeniably have the power to estop the government." Best v. Stetson, 691 F.2d 42, 44 (1st Cir. 1982) (citing United States v. Rexach, 558 F.2d 37, 43 (1st Cir. 1977).

Courts that decline to apply principles of estoppel against the government will consider whether the public interest in compliance with statutory procedures overrides the equities that would appropriately be considered in a purely private transaction. See Phipps v. MBTA, *supra* at 693. As this Court noted during trial, if this matter involved a purely private transaction, the various agreements would have to be interpreted and enforced in a commercially reasonable

fashion by assessing whether or not the elements of estoppel were present and equity demanded enforcement.

The necessary elements to establish estoppel in Massachusetts are: (1) "A representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made," (2) "An act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made," and (3) "Detriment to such person as a consequence of the act or omission." Croft v. National Bedding Co., 2006 WL 1716754, *3 (D.Mass.,2006) (citing Frederick v. Conagra, Inc., 713 F.Supp. 41, 45 (D.Mass.1989) (internal quotation marks omitted)).

Each of the elements of estoppel are indeed present here. The City represented an urgent need for salt to protect its interest in public safety; ISCO provided the salt based on that representation in spite of a failure to agree on price while expressly reserving its right to request that the Court supply the price term; and, ISCO was detrimentally affected by its decision to provide salt based on the City's then representation of an emergency situation. What further distinguishes this matter from the contract cases wherein courts have declined to apply estoppel against a government entity is that what is at stake is not just a balancing of one public interest against a private economic gain or loss; rather, in this situation the public interest in uniformity of contract and public bidding procedures must be weighed against not only the inequity borne by ISCO but also the overriding public interest in the health and safety of the public itself.

This is not a case where application of estoppel principles to enforce the agreement would "run counter to express judicial as well as legislative policy." McAndrew v. School Committee of Cambridge, 20 Mass.App.Ct. 356, 361 (1985). Rather, this is a case where application of estoppel effects a protection of the public interest that is consistent with the

legislative policy and statutory purposes of M.G.L. c. 30B. Unlike the public bidding statute at issue in the <u>Phipps</u> decision cited above[2], which concerned the sale of real estate by the MBTA, Chapter 30B contains an express provision authorizing circumvention of statutory requirements where necessary to protect the health or safety of the public. <u>See</u> 387 Mass. at 691; M.G.L. c. 30B, §8.

Further, while the City makes much of a lack of writing or mayoral signature memorializing the agreement, ISCO posits that the totality of the circumstances, including the parties' prior dealings as well as the issuance of City purchase orders bearing the stamp of approval of the City's Auditor, minimize the importance of such technicalities, in light of the urgency of the situation. Indeed, the <u>Phipps</u> court itself noted that there are "circumstances in which noncompliance with bidding requirements has been characterized as technical rather than substantive, as a minor deviation not requiring invalidation of a bid or contract." 387 Mass. at 692 (citing <u>Lawrence v. Falzarano</u>, 380 Mass. 18, 22 (1980); <u>Chick's Constr. Co. v. Wachusett Regional High School Dist. Comm'n</u>, 343 Mass. 38, 41 (1961), and cases cited).

In analyzing the inappropriateness of denying the application estoppel and invalidating this contract, the question becomes whether invalidation is necessary to fulfill the legislative purpose of c. 30B, or whether that purpose will remain intact in spite of enforcement in the interests of public safety protection and equity. <u>See</u> <u>Phipps</u>, 387 Mass. at 692. (citing <u>Lawrence v. Falzarano</u>, *supra* at 23 – 25). "A common thread underlying [the courts'] reluctance to apply principles of estoppel to public entities has been the idea that deference to legislative policy should trump individual acts or statements of a government official that may be contrary to such

---

[2] The statute at issue in <u>Phipps</u> was M.G.L. c. 161A, §5(b) which had been previously amended to expressly eliminate the MBTA's authority under §5(b) to sell to other than the highest bidder where it found that "sound reasons in the public interest require otherwise." <u>See</u> 387 Mass. at 691 (comparing G.L. c. 161A, Section 5(b), as appearing in St. 1966, c. 636, with G.L. c. 161A, Section 5(b), inserted by St. 1964, c. 563, Section 18).

policy." <u>Sullivan v. Chief Justice for Admin. and Management of Trial Court</u>, 448 Mass. 15, 30

– 31 (Mass. 2006). In <u>Sullivan</u>, the Massachusetts Supreme Judicial Court found that statements

of the Chief Justice for Administration and Management ("CJAM") at issue were intended to

ensure safe conditions at the Sullivan Courthouse and therefore were "not of the sort that negated

requirements of law intended to protect the public interest such that the plaintiffs should be

precluded from asserting a claim for estoppel." <u>Id</u>. The CJAM argued that the application of

estoppel would defeat a significant public interest in centralized management of the court system

under M.G.L. c. 211B, § 9(vii), however the SJC ruled that this interest would not be "unduly

hindered by the application of principles of estoppel." <u>Id</u>. at 31. ISCO asserts that the same

rationale applies in this instance and that application of estoppel principles, while furthering the

City's interest in the health and safety of its citizens will not unduly hinder the legislative

purposes of the bidding statute.

## II.     WHERE NO PRICE WAS AGREED UPON, THE COURT MAY SUPPLY A REASONABLE PRICE TERM BASED ON FAIR MARKET VALUE

### A.     Absence of a Price Term Does Not Render the Agreement Unenforceable

Under reservation of rights, ISCO agreed to provide the additional 27,000 tons of Rock

Salt required by the City due to emergency conditions, in spite of the fact that the parties had not

agreed on a price for the additional tonnage. As the City itself has conceded, the absence of an

agreed upon price term in a contract for the provision of goods is not fatal to the contract itself.

The Massachusetts Uniform Commercial Code, which clearly applies in this instance by virtue of

its incorporation into the City's bid documents[3], expressly states that parties to a contract for sale

of goods may conclude said contract even if the price is not settled. M.G.L c.106, §2-305. In

---

[3] <u>See</u> Trial Exhibit 2, Contract, Standard Contract General Conditions, Section 11.1 and Invitation for Bids, Section 7.1.

such a case, where the price is left to be agreed upon by the parties and they fail to agree, the Code states that the price is determined to be "a reasonable price at the time for delivery." Id.

"In determining whether an agreement which lacks definiteness in terms of price is nonetheless enforceable, courts should ask whether the parties intended to contract with one another and there is a reasonably certain basis for providing an appropriate remedy." Armstrong v. Rohm and Haas Co., Inc. 349 F.Supp.2d 71, 78 (D.Mass.,2004) (citations omitted). Where it is clear that the parties intended to enter into a contract, courts will, if reasonably possible, interpret a contract so as to make it valid and enforceable. See Shayeb v. Holland, 321 Mass. 429, 433 (1947) (where no price was specified in a contract for sale of land, Court implied a "fair and reasonable price" equivalent to the fair and reasonable value of the premises).

When the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court. See Fay, Spoffard & Thorndike, Inc. v. Massachusetts Port Authority, 7 Mass. App. Ct. 336, 342 (1979) (contract failed to deal expressly with the compensation to be received by plaintiff) (citing Restatement (Second) of Contract §204). Courts will then interpret the contract sensibly in light of the terms of the document taken as a whole. See Fay, Spoffard & Thorndike, Inc., 7 Mass. App. Ct. at 342.

In those circumstances, a court will not base its decision on evidence of prior negotiations or agreements, but should supply a term which comports with community standards of fairness and policy rather than analyze a hypothetical model of the bargaining process. See President Fellows of Harvard College v. Peco Energy Co., 57 Mass. App.Ct. 888, 896 (2003) (citing Restatement (Second) of Contract §204).

**B.    The Court Should Supply a Reasonable Price Term Reflective of the Fair Market Value of the Excess Salt at the Time of Delivery in 2005**

In spite of the fact that no price term was agreed upon, the circumstances taken as a whole make clear that ISCO and the City intended to form a contract for the provision of the additional Rock Salt or extend the existing contract for that purpose, excepting the provision governing price. The parties clearly intended to contract with each other for the provision of additional salt, as evidenced by the City's issuance of purchase orders and payments.

As the original contract provided all of the essential terms governing subject matter, specifications, delivery methods and locations, etc., thus there was no need to renegotiate those terms. The written terms of the initial contract for 75,000 tons were all applicable, save for price. All that was left open was the question of price and the City issued additional purchase orders under clear notice of an absence of agreement on price and in the face of ISCO's reservation of rights on that issue. ISCO proposed to continue deliveries at a price of $42.36 per ton, in an effort at compromise, however the City effectively rejected that offer by failing to respond to the proposal. Given the urgent nature of the situation as it was communicated by the City and the need to mitigate potential public health and safety threats, ISCO's principals felt duty-bound – both morally and in the interest of future business relations—to provide the salt under reservation of right to have the price term judicially determined. Thus, in light of the enforceability of the parties' agreement, all that remains for the court to determine is a reasonable price in the absence of the parties' agreement on that issue.

ISCO has provided not just one, but two reasonably certain bases upon which the Court can draw in determining a reasonable price. The first exists in an assessment of the reasonable market value of Rock Salt at the time the additional salt was delivered to Boston. This can be adduced from an analysis of the market price being paid by other municipalities and states. This

information was presented at trial in the form of the Massachusetts bid recaps for 2004 and 2005,
Trial Exhibits 25 and 26. Exhibit 25 reflects that in mid-November, 2004, another company,
Cargill Salt, secured a contract for 44,500 tons of salt at a price of $56.37 per ton. The Eastern
Salt Company submitted a proposal at $63.95 in response to that same bid request. Exhibit 26,
the 2005 Bid Recap, reflects that in response to a February 2005 bid request, the Salem County
Co-op in New Jersey obtained 6,600 tons of salt at $52.26 per ton. Other bids submitted in
respect of that same procurement ranged from $58.12 to $71.63 per ton.

ISCO has also provided the Court with a second reasonable basis upon from which to
determine price, namely the increase in shipping costs incurred by ISCO in delivering additional
quantities of salt above the original contact amount to Boston. As the Stipulation of Facts, ¶ 38
and the trial testimony established, ISCO's salt supplies originate in Chile. ISCO supplies its
Boston based terminal (located in Charlestown) by contracting for shipments from Chile to
Boston under long term bulk contracts known as contracts of afreightment. ISCO was able to
meet the Boston's initial requirement for 75,000 tons out of its existing salt inventory and its
long term shipping contracts. Stipulation, ¶ 38. To provide the additional 27,000 tons ISCO had
to turn to the ocean freight "spot market." Stipulation, ¶ 39.

Thomas Labash of Empremar testified that Empremar is responsible for arranging the
ocean freight contracts by which ISCO ships salt from Chile to Boston. He testified that the cost
of ocean freight increased dramatically during the 2004-2005 season as a result of increased
ocean freighter fuel costs and a high demand for ocean freight for shipping to and from China.
Those increases are reflected in the Baltic Supramax Index, Trial Exhibit 29, which reflects the
average cost per day of contracting an ocean-going freighter.

Because the Boston terminal employed by ISCO lacks its own cranes, deliveries to Boston must be made by ships equipped with self unloading gear, i.e. "SUGS." In order to meet the City of Boston's demand for increased salt quantities, Labash diverted a ship, the Mandarin Sun, from its original destination in Newark, New Jersey, and sent it to Boston. To make up for the Mandarin Sun's diversion, Labash was required to turn to the spot market and arrange for a ship to deliver a replacement load to Newark. He testified that spot market shipments to Newark during that time frame averaged $30.00 dollars per ton and that had a SUG been available and sent to Boston, it would have cost an additional two ($2.00) per ton, or a total of $32.00 per ton. This represented a cost increase of $20.00 per ton over what it cost ISCO to supply the initial 75,000 tons called for under the original contract.

Thus, by either measure, $56.42 per ton represents a fair and reasonable price per ton at which to determine at what rate the City should compensate ISCO for delivery of the additional 27,021.84 tons of salt in excess of the original contract quantity. This amounts to a total of five hundred forty thousand, four hundred thirty six dollars and eighty cents ($540,436.80).

Pursuant to M.G.L. c. 261, §6C, to the foregoing principal amount due, the Court should award interest at the statutory rate of twelve percent per annum from the date of the breach or the date of demand set forth in Mr. Epstein's demand letter of April 15, 2005, Trial Exhibit 20. As thirty-four months have, since intervened to date, interest of no less than $183,748 should be added to the principal for a total of $724,185.

## III.    CONCLUSION

In sum, Plaintiff International Salt Co., LLC states that its contention that the agreement for the delivery of an additional 27,000 tons of Rock Salt to the City of Boston stands as an enforceable contract under principles of both law and equity. The City's weighty interest in

protecting the health and safety of the public in concert with the legislative purpose behind the emergency provision of the public bidding statute should override any reluctance to apply the equitable principles of estoppel against the City in this instance. Therefore, the contract should be enforced and the Court should supply a reasonable price term of $56.42 per ton to reflect the fair market value of the Rock Salt at the time of delivery in 2005 as well as the increase costs which ISCO incurred in supplying the product.

Such an award, coupled with interest, results in no windfall for ISCO, but only compensates it for the out-of-pocket expenses it incurred in honoring the City's urgent demand for additional Rock Salt in order to prevent an imminent risk to public health and safety. Nor does such an award compensate ISCO for the costs and legal fees associated with prosecuting this action.

Respectfully submitted,

INTERNATIONAL SALT CO., LLC

By its attorneys,

/s/ Bruce W. Edmands
Bruce W. Edmands (BBO#151360)
Julia B. Vacek (BBO#664689)
ECKERT SEAMANS CHERIN & MELLOTT
One International Place
Boston, MA 02110
Tel: 617-342-6886

Date: February 15, 2008

{K0364340.2}                                    16

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INTERNATIONAL SALT COMPANY, LLC, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 0510921-RGS |
| | ) | |
| CITY OF BOSTON, | ) | |
| Defendant | ) | |

ANSWER OF DEFENDANT CITY OF BOSTON
TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Interrogatory No.1

Please identify and describe in detail the records and documentation and the record keeping, and/or data management procedures which the City of Boston employed or will employ during the period of January 1, 2000 through December 31, 2006 for purposes of tracking, recording and/or otherwise maintaining an accounting of daily, weekly, monthly, and/or other periodic inventories of bulk rock salt procured by the City for purposes of responding to snow and ice accumulations.

Answer No.1

From 2000 to 2002 this was done manually by the former (retired) Assistant Superintendent Ralph Riley. After Mr. Riley's' retirement, salt became the responsibility of Michael Dennehy. Mr. Dennehy's record keeping consisted of the spreadsheets attached as Exhibit A. At any given time, Superintendent Joe Canavan would ask for verbal inventory amounts for each of the City's eight salt depots based on Mr. Dennehy's records of incoming (deliveries) and outgoing (storm usage) materials.

Interrogatory No.2

Please identify the persons in charge of keeping and/or maintaining the records identified in response to Interrogatory Number 1.

Answer No.2

Michael Dennehy, Public Works Department.

Interrogatory No.3

For each day during the period January 1, 2000 through May 15, 2006, please supply in a Microsoft Excel Spreadsheet in the format annexed at Appendix A, (or some otherwise compatible digital format), which states for each date:
A.    The date;
B.    The total amount of rock salt on hand at the beginning of that date;
C.    The total amount of rock salt delivered to the City of Boston during that day;
D.    The total amount of rock salt used, consumed or disbursed during that day; and
E.    The total amount of rock salt on hand at the end of the day.

Answer No.3

Objection.  This interrogatory is unduly broad, vague and not calculated to lead to the discovery of admissible evidence.  Answering further, the defendants state that the information requested by the plaintiff is not available or cannot be located, after diligent search.  Notwithstanding said objection, see attached spreadsheets at Exhibit A.  The attached spreadsheets represent all the contemporaneous records kept by the City and pertaining to salt inventories during the referenced time periods.

Interrogatory No.4

Please state what the City contends was the fair market value per ton of rock salt in New England as of February 11, 2005 and March 10, 2005, and state all facts and identify all documents on which the City relies and will rely at trial in support of such contention.

Answer No.4

The City, at present, has no opinion or contention as to the market value per ton of rock salt during the period described in this interrogatory.

Interrogatory No.5

Please state the extent to which, during the term of the ISCO-Boston Contract, the City contends it was entitled to purchase from ISCO quantities of salt in excess of 75,000 tons and state all facts and identify all documents on which the City relies in support of such contention.

Answer No.5

The City was entitled to purchase from ISCO quantities of salt in excess of 75,000 tons to the extent permitted by ISCO's contract with the City of Boston.  The City consulted the contract documents in responding to this interrogatory.  The City relies on

the language in the contract expressly stating that the 75,000 ton figure is an estimate only, and that ISCO would be expected to ship salt for the entire term of the contract.

Interrogatory No.6

Please identify each occasion during the last twenty years in which the City purchased salt in excess of the amount specified in its annual vendor procurement contract and, with respect to each such occasion, please provide the following information:
a.    The relevant fiscal year;
b.    The vendor(s) with which the City contracted in that fiscal year;
c.    The quantity of salt specified in the contract;
d.    The price per ton of salt specified in the contract;
d.[sic]    The amount of salt which the City purchased in excess of the contract amount;
d.[sic]    The price per ton the City paid for quantities purchased in excess of the initial contract amount.
e.    The identity of each document on which the City relied in compiling the foregoing information.

Answer No.6

NB:  By agreement of the parties, the scope of interrogatory 6 has been limited to the past ten years.

a.    FY 1994
b.    AKZO Salt Co. (75k tons) and Granite State Minerals
c.    75,000 tons in initial contract with AKZO.
d.    Approximately $25 per ton.
d.    Approximately 25,000 tons.
d.    Approximately $50 per ton.
e.    The City is in the process of locating the documents relevant to this activity.  The above information is supplied to the best memory of Vincent Caiani.  The City will supplement this response as documents are located.

Interrogatory No.7

As of February 11, 2005, did the City of Boston have a need for salt in excess of the 75,000 tons specified in the ISCO-Boston Contract, and if so, please describe in detail the circumstances giving rise to such need and state whether a refusal on the part of ISCO to deliver shipments in excess of 75,000 tons would have presented a risk of danger to the health or safety of people or property and identify each document on which the City relied in preparing a response to this Interrogatory.

Answer No.7

The City placed an order for 25,000 tons of salt on February 11, 2005, in order to be best prepared to deal with any potential need for said salt. Any hypothetical refusal of ISCO to perform under its contract would have been dealt with had it occurred. Because it did not occur, the City had (and has) no occasion to form a contention as to whether any risk to health or safety of people or property would have been presented by such a hypothetical occurrence. The City consulted no documents in responding to this interrogatory.

Interrogatory No.8

Please state whether the City contends that the circumstances giving rise to the issuance of purchase orders on February 11, 2005 for 25,000 tons and on March 11, 2005 for 3,000 tons of salt, each order in excess of the original contract amount, posed a risk of danger to the health or safety of people or property and state all facts in support of its contention and identify each document on which the City relied in preparing its response to this Interrogatory.

Answer No.8

The City does not contend that the circumstances posed a risk of danger to the health or safety of people or property. The City consulted no documents in responding to this interrogatory.

Interrogatory No.9

Please identify each expert witness on whom you intend to rely at trial, identify each communications [sic] between the City and such expert and identify each report, whether in draft or otherwise, that the City has received from such expert.

Answer No.9

The City has not yet identified, communicated with, or engaged any expert witness. The City will supplement this answer as necessary.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY this 22 day of June, 2006.

By: _Vincent A. Caian_

Name: _Vincent A. Caiani_

Title: _Asst. Purchasing Agent_

Position: _____

AS TO OBJECTIONS:

_Justin Kollar_

Justin F. Kollar, Esq.
Assistant Corporation Counsel