UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10921-RGS

INTERNATIONAL SALT COMPANY, LLC

v.

CITY OF BOSTON

FINDINGS OF FACT AND RULINGS OF LAW
AFTER A NON-JURY TRIAL

April 18, 2008

STEARNS, D.J.

During the winter and early spring of 2004-2005, the City of Boston (City) experienced an unusual number of heavy snowfalls. This case involves the City's contract to purchase the road salt that was used by the Department of Public Works to melt snow and ice on city streets. On May 4, 2005, the City's supplier, International Salt Company, LLC (ISCO), sued the City seeking legal and equitable remedies for breach of implied contract. A trial without jury was held in January of 2008. After the taking of evidence, the parties were given leave to file proposed findings of fact and rulings of law. They did so in February of 2008. The court then heard final argument. For reasons that will be explained, the court concludes that ISCO has no viable claim of recovery against the City.

FINDINGS OF FACT

The court makes the following findings of fact based on the parties' stipulations as supplemented by the credible evidence presented at trial.

1. On August 23, 2004, the City posted an invitation soliciting bids for a 75,000 ton supply of road maintenance sodium chloride bulk (salt) for the coming winter.

2. Bids were opened and read on September 8, 2004. On September 23, 2004, the City informed ISCO by fax that it had submitted the winning bid. The notification stated in part: "The following items have been awarded to your company: Item 1."

3. The notation "Item 1" referred to Item 01 in the bidding documents. Item 01 specified the delivery by ISCO of 75,000 tons of salt to the City at a bid price of $36.42 per ton, for a total of $2,731,500.

4. On October 20, 2004, ISCO accepted the City's offer in writing. The executed contract (# 15878-05) incorporated the invitation for bids as well as ISCO's response.

5. The contract contained several pertinent provisions. ISCO's incorporated bid response stated that: "The total bid price for this contract is $36.42/T; Thirty-six dollars forty-two cents per ton = $2,731,500.00; Two million seven hundred thirty-one thousand five hundred dollars no cents." The section of the contract listing "price components of the bid price" noted: "Total contract. Based upon 75,000 tons." On the signature page, entitled "Standard Contract," the term was specified as running from October 1, 2004, through and including June 30, 2005. On the same page, in bold type, the contract stated: "TOTAL AMOUNT NOT TO EXCEED $2,731,500."

6. Page 19 of the contract contained a provision stating that: "PRICE WILL BE HELD FOR THE TERM OF THE CONTRACT AND SHALL NOT BE LIMITED TO THE ESTIMATED NUMBER OF ITEMS." At no other place in the contract is the word "estimate" used to describe the quantity of salt to be delivered.

7. On October 13, 2004, Dennis Coughlin, the City Auditor, certified the appropriation of funds.

8. The final contract was approved in writing by Mayor Thomas M. Menino on October 20, 2004.

9. During January of 2005, the City experienced 43.3 inches of snowfall. In February, 17.7 inches fell, and in March, 14.5 inches.

10. By February 4, 2005, ISCO had delivered 70,848 tons of salt to the City. As of February 7, 2005, the City had an inventory of approximately 28,117 tons of salt on hand in its storage yards.

11. On February 7, 2005, Daniel Thompson, ISCO's Vice President of Highway Bidding, sent a letter by fax to Vincent Caiani, the City's Assistant Purchasing Agent. In the letter, Thompson stated that because of increases in ocean freight costs, ISCO was raising its price for salt from $36.42 per ton to $46.36 per ton, effective with any order in excess of 75,000 tons.

12. In response, Cainai telephoned Thompson and insisted that ISCO honor all City orders (whether or not in excess of 75,000 tons) at the $36.42 per ton contract price.

13. The following day, February 8, 2005, William Hannon, the City Purchasing Agent, spoke by telephone with Thompson. Hannon told Thompson that the City was prohibited by the Massachusetts public bidding law from paying more than the contract price of $36.42 per ton. Thompson stated that ISCO's contractual obligations to the City would end once it had completed delivery of 75,000 tons of salt. Thompson insisted that because of increased shipping costs, ISCO could not agree to provide additional salt to the City at the $36.42 price.

14. On February 10, 2005, Hannon wrote to Robert Jones, the Chief Executive

Officer of ISCO. He stated that the 75,000 ton figure referenced in the contract was merely an estimate. Hannon told Jones that ISCO was required to continue to deliver salt to the City through the termination date of the contract on June 30, 2005, at the contract price of $36.42 per ton regardless of the amount of salt the City ordered.

15. On February 10, 2005, Joseph Casazza, the Commissioner of Public Works, telephoned Jones. Hannon and Cainai listened in on the conversation in Casazza's office, while Thompson listened in from Jones's office. Casazza told Jones that the City needed more than 75,000 tons of salt to get through the winter and demanded written assurances that ISCO would supply whatever amount of salt the City ordered. Casazza threatened to hold ISCO responsible for streets rendered unsafe because of any lack of salt.[1]

16. Jones acquiesced to the demand for deliveries of salt in excess of 75,000 tons, but reiterated that ISCO would charge the City a higher price per ton because of the increased shipping costs.

17. Immediately after the telephone call, Jones wrote a letter to Casazza (faxed the following day) confirming ISCO's agreement to continue to provide salt to the City. The letter stated that the price per ton for salt delivered in excess of 75,000 tons was "yet to be agreed to or determined." It further stated that in the absence of an agreement, ISCO reserved the right "to have the price determined by a court . . . on the basis of fair market value."

18. On February 11, 2005, ISCO's outside counsel sent a letter to Hannon stating

---

[1] Casazza recalled (mistakenly) that the conversation was with Arthur Bush, another officer of ISCO.

that the contract expressly obligated ISCO to provide only 75,000 tons of salt at $36.42 per ton, and that ISCO's contractual obligations would end once the 75,000 tons were delivered. The letter also stated that ISCO would supply salt to the City in excess of 75,000 tons at a price to be negotiated or to be determined by a court.

19. On February 11, 2005, the City issued a purchase order (# 0000287141) to ISCO for 25,000 additional tons of salt. The purchase order listed a price of $36.42 per ton, for a total of $910,500. The delivery date was specified as February 10, 2005. The purchase order bore a stamp by Sally Glora, the City's Auditor/Business Manager, indicating that the necessary funds had been appropriated .

20. On February 16, 2005, ISCO completed delivery of 75,000 tons of salt to the City. From February 16 through March 14, 2005, ISCO made eighteen additional deliveries of salt, totaling 27,021.84 tons.

21. The use of road salt is crucial to public safety during snowstorms. It melts snow more rapidly than sand and has a lower after-event cleanup cost.

22. ISCO was able to supply the City's initial requirement of 75,000 tons of salt from the inventory held at its facility in Charlestown, Massachusetts. In order to meet the City's additional request, ISCO turned to the ocean freight "spot market."

23. On February 18, 2005, Jones sent a letter to Hannon stating that ISCO had satisfied its contractual obligations by supplying the City with 75,000 tons of salt. Jones repeated ISCO's February 10 position that the deliveries of additional salt were under protest. The letter stated that for deliveries over 75,000 tons, the City would be invoiced at $36.42 per ton, with the understanding that ISCO reserved the right to seek a price

increase based on a court-determined fair market value if the parties could not agree in the interim. In the alternative, ISCO proposed that the parties enter into a separate contract for deliveries in excess of 75,000 tons at a price of $42.36 per ton.

24. The City did not respond to ISCO's letter of February 18, 2005.

25. On March 11, 2005, the City issued a purchase order (# 0000291021) to ISCO for 3,000 tons of salt. The purchase order stated a price of $36.42 per ton, for a total of $109,260. The purchase order bore a stamp by the City Auditor/Business Manager indicating that funds had been appropriated.

26. One month later, on April 15, 2005, the City issued a purchase order (# 0000297376) to ISCO for 50 tons of salt. The purchase order stated a price of $36.42 per ton, for a total of $1,821. The purchase order bore a stamp by the City's Auditor/Business Manager indicating that funds had been appropriated.

27. On the same date, April 15, 2005, ISCO's counsel sent a letter to Hannon noting that the City had not responded to ISCO's prior letters concerning the increased price. Instead, the City had simply continued to order salt at the contract price. The letter continued that "[b]y placing orders in excess of contractually-established tonnage, the City implicitly agreed to pay the fair market value for any amounts of Rock Salt in excess of 75,000 tons." The letter stated that ISCO had delivered 27,021.84 tons of salt in excess of the agreed 75,000 tons. It additionally stated that the fair market value for rock salt in the Boston area during the period of the excess deliveries was $56.37 per ton. Accordingly, it was ISCO's position that the City owed it an additional $1,523,221.10 (27,021.84 tons x $56.37).

28. On April 20, 2005, Hannon replied to counsel's letter. Hannon stated that ISCO had been repeatedly informed that the contract allowed the City to purchase salt in excess of 75,000 tons at $36.42 per ton. In addition, Hannon stated that the Massachusetts bidding law and the City Charter did not permit any interim increase in the price per ton. Hannon noted that each purchase order for salt in excess of 75,000 tons had explicitly stated that the City would pay only $36.42 per ton.

29. The City paid ISCO $36.42 for each ton of salt delivered by ISCO from October of 2004, through June of 2005, including the amount in excess of 75,000 tons.

30. Under the City's competitive bidding process, four to six weeks is normally required to process orders for the procurement of bulk goods.

31. The City's inventory of unused rock salt at the close of the 2005 snow season was in excess of 29,000 tons.

## RULINGS OF LAW

1.    The Parties' Positions

ISCO argues that it had fully performed its obligations under the contract when it completed delivery of 75,000 tons of salt to the City. ISCO contends that the supplemental agreement for delivery of an additional 27,000 tons of salt is enforceable under the emergency provision of Mass. Gen. Laws ch. 30B, § 8, and by operation of the doctrine of equitable estoppel. It requests that the court determine a reasonable price reflecting the fair market value of the excess tonnage. The City, on the other hand, insists that the 75,000 ton figure listed in the contract was intended only as an estimate. It maintains that the terms of the original contract gave it the right to purchase unlimited quantities of salt

at a price of $36.42 per ton through June of 2005. The City argues that it was statutorily prohibited from paying a higher price per ton and that ISCO was made repeatedly aware of that fact. Moreover, the City argues that no emergency triggered the provisions of Mass. Gen. Laws ch. 30B, § 8.

### 2.   The Original Contract

"Contract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court; contract law, unlike tort law, thus favors judicial resolution of disputes." Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48 (1st Cir. 2004). The parties disagree over the significance of the clause: "PRICE WILL BE HELD FOR THE TERM OF THE CONTRACT AND SHALL NOT BE LIMITED TO THE ESTIMATED NUMBER OF ITEMS." While the City argues that this provision clearly states that the 75,000 ton figure was only an estimate, ISCO contends that the bidding documents state otherwise. "Even if an aspect of an agreement is informal, obscure, difficult of satisfactory interpretation, and the subject of dispute by the parties as to its meaning, a court should '[s]o far as reasonably practicable . . . give it a construction which will make it a rational business instrument and will effectuate what appears to have been the intention of the parties.'" Finn v. McNeil, 23 Mass. App. Ct. 367, 372 (1987). "Agreements, especially commercial arrangements, are designed to make sense. If one reading produces a plausible result for which parties might be expected to bargain, that reading has a strong presumption in its favor as against another reading producing an unlikely result (e.g., windfall gains, conditions that cannot be satisfied, dubious incentives.)." National Tax Inst. v. Topnotch at Stowe Resort and Spa, 388 F.3d 15, 19 (1st Cir. 2004). When construing

a commercial contract, "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001).

On the first day of trial, the court ruled that the City's interpretation of the contract was commercially unreasonable and that ISCO had fully discharged its contractual obligations by delivering 75,000 tons of salt to the City in conformance with the terms of the original contract. Nowhere in the bid documents is the 75,000 ton figure explicitly described as an estimate. The item bid upon was listed as "quantity: 75,000 tons of sodium chloride bulk," with no hint that the quantity as defined was only an estimate or approximation. In addition, the written instrument repeatedly states that the "total contract" is "based upon 75,000 tons," and that the "total contract price" is "not to exceed" $2,731,500. Rules of construction counsel that a court read a contract as a whole when interpreting a disputed part, rather than balkanizing the language in an attempt to give freestanding significance to an isolated contradictory term. See Smart v. The Gillette Co. Long- Term Disability Plan, 70 F.3d 173, 179 (1st Cir. 1995). The single reference to an "estimate" on page 19 of the contract (which makes no mention of salt or tonnage) is clearly boilerplate purchase order language and not a term tailored to modify the meaning of the term "quantity" as it is used elsewhere in the contract. It should not therefore be read as trumping the numerous provisions identifying the goods to be purchased as 75,000 tons of salt.

  3.  Subsequent Dealings

Although ISCO may have won the skirmish, it does not thereby win the war.

Because ISCO discharged its obligations under the original contract, any subsequent dealings with the City may only be construed as an attempt to form a new contract.[2] Massachusetts law and the Boston City Charter require strict adherence to statutory bidding procedures. Mass. Gen. Laws ch. 30B sets out procurement procedures that must be strictly adhered to.[3] The statute requires, *inter alia*, that the City advertise bids for a period of two weeks, accept bids from all suppliers, and award the contract to the lowest bidder. See Mass. Gen. Laws ch. 30B, §§ 4 and 5. All contracts valued at five thousand dollars or more must be in writing, and a "contract made in violation of [chapter 30B] shall not be valid, and the governmental body shall make no payment under such contract." Id. at § 17(a) and (b). The City Charter further specifies that "[a]ll contracts made by any department of the City of Boston . . . shall, when the amount involved is $10,000 or more, . . . be in writing; and no such contract shall be deemed to have been made or executed until the approval of the mayor of said city has been affixed thereto in writing and the

---

[2] While ISCO at times takes the position that the additional tonnage was delivered under an "extension" of the original contract, that position as a practical matter is self-defeating. Under Mass. Gen. Laws ch. 30B, § 13, a municipal purchasing agent is authorized to pay a sum over and above the total price of the original contract when ordering "road salt or other ice and snow control supplies," so long as it is specified in writing that the increase is necessary to fill the actual needs of the City, and that an increase is more "economical and practical" than awarding another contract. While the statute allows for an increase in the total contract price, it explicitly forbids an increase in the price-per-unit. Id. at §§ 13(1), 13(2), and 13(4). Accordingly, the parties would have been free under the statute (as they did) to increase the quantity of salt shipped to the City under the existing contract, but not to increase the price per ton.

[3] The only exceptions to the strict adherence rule concern minor deviations from statutory bidding requirements, such as clerical errors or a failure to complete a nonessential part of a bidding form. See E. Amanti & Sons, Inc. v. Town of Barnstable, 42 Mass. App. Ct. 773, 778 (1997); Sciaba Constr. Corp. v. City of Boston, 35 Mass. App. Ct. 181, 185 (1993).

auditor of said city has certified thereon that an appropriation is available therefor or has cited thereon the statute under authority of which the contract is being executed without appropriation." St. 1980, ch. 418, § 6, as amended by St. 1998, ch. 262, § 1.

"Statutory and charter provisions restricting the manner in which municipal funds may be expended serve the salutary functions of placing cities and towns on a sound financial basis and preventing waste, fraud, and abuse." United States Leasing Corp. v. City of Chicopee, 402 Mass. 228, 231 (1988). See also Phipps Prods. Corp. v. Massachusetts Bay Transp. Auth., 387 Mass. 687, 691-692 (1982) ("Statutory bidding procedures are designed to prevent favoritism, to secure honest methods of letting contracts in the public interest, to obtain the most favorable price, and to treat all persons equally."). "The purpose of requiring a written contract, with the signatures of certain city officials affixed thereto, is to attach a 'paper trail' to the city's contractual commitments that is capable of being scrutinized by the public, and for which municipal officials are ultimately accountable." Park Drive Towing, Inc. v. City of Revere, 442 Mass. 80, 84 (2004). "A contract with the city is not formed until the necessary statutory requirements are fulfilled." Urban Transp., Inc. v. Mayor of Boston, 373 Mass. 693, 696 (1977).

ISCO is chargeable with knowledge of the requirements of the bidding law and the City Charter and is therefore bound by their terms. McGovern v. City of Boston, 229 Mass. 394, 397 (1918); City of Marlborough v. Cybulski, Ohnemus & Assocs.,Inc., 370 Mass. 157, 160 (1976). "Persons dealing with a municipality must take notice of limitations of this kind upon the contracting power of the municipality and are bound by them and cannot recover upon contracts attempted to be made in violation of them." Massachusetts Gen.

Hosp. v. City of Revere, 385 Mass. 772, 775 (1982), overruled on other grounds, City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239 (1983) (citation omitted). See also Sancta Maria Hosp. v. City of Cambridge, 369 Mass. 586, 595 (1976). A plaintiff seeking recovery bears the burden of proving strict compliance with these limitations. Richard D. Kimball Co. v. City of Medford, 340 Mass. 727, 729 (1960); Dos Santos v. City of Peabody, 327 Mass. 519, 520-521 (1951). Strict adherence to bidding procedures is required even where no harm to the public can be shown, and even in cases like this, where the violation can be said to have conferred a public benefit. Phipps, 387 Mass. at 692. The Supreme Judicial Court has "consistently and punctiliously" held that one providing goods or services to a city or town cannot recover if requirements such as those contained in a City Charter or the General Laws have not been met. Chicopee, 402 Mass. at 231; Dos Santos, 327 Mass. at 521. Here, only one requirement was met: the purchase orders were certified by the City Auditor. Accordingly, unless the emergency provision of Chapter 30B of the General Laws applies, ISCO has no contractual recourse against the City.

    4.    State of Emergency

ISCO contends that the public bidding requirements were not applicable because the parties were acting in accordance with the emergency procurement provision**s** of Chapter 30B. Section 8 of that Chapter provides, in pertinent part:

> [w]henever the time required to comply with a requirement of this chapter would endanger the health or safety of the people or their property a procurement officer may make an emergency procurement without following that requirement. An emergency procurement shall be limited to only supplies or services necessary to meet the emergency and shall conform to the requirements of this chapter to the extent practicable under the

circumstances.[4]

At first blush, ISCO's argument is appealing. It is after all undisputed that salt is critical in keeping City streets safe during snow emergencies for all vehicles, and especially emergency vehicles. It is also beyond dispute that the City was alarmed by the prospect that its inventory of salt might be depleted, and that as a result it pressured ISCO to guarantee deliveries over and above the originally contemplated 75,000 tons. The emergency provision of Chapter 30B is, however, narrowly construed. In an early case, in which a City sought to justify a suspension of bidding rules because of streets in need of "emergency" repairs, the SJC commented as follows.

> Without attempting an exact or all-inclusive definition, it is manifest that [the "emergency"] language does not apply to a condition which may clearly be foreseen in abundant time to take remedial action before serious damage to the health or to the safety of person or property is likely to occur. Without doubt, lack of foresight and failure to take proper precaution to meet contingencies which any prudent person would anticipate might occasion a condition which would jeopardize public health and safety, and to which the words of the [emergency statute] would be applicable. It would be remarkable, however, if the legislators used them to describe such a situation. It is not to be supposed that they intended to make it possible for municipal officers to avoid advertising bids for public work by merely delaying to take action to meet conditions which they can foresee until danger to public health and safety has become so great that the slight further delay caused by advertising will entail public calamity.

---

[4] Section 8 further provides: "The procurement officer shall make a record of each emergency as soon after the procurement as practicable, specifying each contractor's name, the amount and the type of each contract, a listing of the supply or service provided under each contract, and the basis for determining the need for an emergency procurement. The procurement officer shall submit a copy of this record at the earliest possible time to the state secretary for placement in any publication established by the state secretary for the advertisement of procurements."

Safford v. City of Lowell, 255 Mass. 220, 225 (1926).[5]

The statute is clear that if compliance with a particular bidding requirement is not feasible because of an emergency, then only *that particular requirement* may be avoided. Here, the City first made it known to ISCO that it wanted an additional quantity of salt on February 7, 2005. As of that date, the City had an inventory of 27,661.04 tons of salt on hand. On a seasonal average, the City had used 4,537 tons per snowfall to treat its streets.[6] On February 11, 2005, by which point the City's salt inventory had been reduced to 26,476.5 tons, it issued a purchase order to ISCO for an additional 25,000 tons. ISCO did not make the first delivery on this purchase order until February 16, 2005 (when it delivered a total of 2,432.61 tons, a portion of which still fell within the initial 75,000 tons allotment). ISCO completed delivery of the additional 25,000 tons on or about March 7, 2005. The court agrees with ISCO that the need for *some amount* of additional salt was perceived by the City as urgent as of mid-February of 2005. The emergency provisions of section 8, however, limit procurements to "only supplies . . . necessary to meet the emergency." ISCO has not shown that 25,000 tons of salt were needed to meet any immediate need of the City. It will be remembered that it took ISCO one and one-half

---

[5]The court notes that the emergency provision at issue in Safford was Mass. Gen. Laws ch. 43, § 28, which was repealed by St. 1984, ch. 484, § 42. That provision, which excepted from the requirement for public bidding "cases of special emergency involving the health or safety of their people or their property," is, however, analogous to Mass. Gen. Laws, ch. 30B, § 8.

[6]There were twelve snowfalls during which the City used rock salt between December 6, 2004, and February 3, 2005. The lowest usage was 414 tons; the highest usage was 9,638 tons.

months to complete delivery of the additional tonnage.[7]

Even assuming that the court were to find that Chapter 30B's emergency provisions fully applied, ISCO must also show compliance with the City Charter. The Charter states that any contract of $10,000 or more shall not be valid without: (1) being reduced to a writing; (2) having the approval of the Mayor affixed thereto; and (3) having a certification from the City's Auditor that an appropriation is available. It is crucial to note that the Charter, unlike Chapter 30B, does not contain an emergency exception. Nor can the court by judicial fiat import such a provision. "It is the function of the court to construe a statute as written and an event or contingency for which no provision is made does not justify judicial legislation." Prudential Ins. Co. of Am. v. City of Boston, 369 Mass 542, 547 (1976). Therefore, full compliance with the Charter is required in order for a valid contract to exist. Here, there is no valid contract because the parties' "agreement" was not reduced to writing, nor was it approved by the Mayor. See Massachusetts Gen. Hosp. v. City of Revere, 385 Mass. at 775 (mayoral signature required for a valid contract even in an arguable emergency where a wounded suspect required immediate medical care). Nor is it ultimately helpful to ISCO that the City's Auditor, pursuant to Gen. Laws ch. 44, § 31C, certified that appropriated funds for the contract were available. "While such a certificate

---

[7]Mass. Gen. Laws ch. 30B, § 17, requires all contracts over $5,000 to be reduced to writing. The emergency provision mandates conformity to the requirements of Chapter 30B to "the extent practicable under the circumstances." Here, the parties engaged in discussions for over a week before the first purchase order was issued. There was more than ample time for the parties to reduce any extended agreement to writing. In addition, ISCO, which has the burden of showing compliance with the statute, has not proven that the requirements of the emergency provisions were met. For example, ISCO has not shown, as required, that the procurement officer made a record of the emergency and submitted a copy of the record to the state secretary. See Mass. Gen. Laws ch. 30B, § 8.

15

will protect a contractor from the assertion by the municipality that appropriations are not adequate to meet payments under the parties' contract, the certificate does not operate to validate a contract that is otherwise void." Baltazar Contractors, Inc. v. Town of Lunenburg, 65 Mass. App. Ct. 718, 722 (2006). Accordingly, even if ISCO could find refuge in section 8's emergency provision, it cannot show the predicate compliance with the City Charter.

     5.    Equitable Estoppel

ISCO contends that, in the alternative, it is entitled to relief under a theory of equitable estoppel. It argues that the public interest in uniform municipal bidding procedures must be weighed against not only "the inequity borne by ISCO but also the overriding public interest in the health and safety of the public at large."[8] Massachusetts courts are, however, "reluctant to apply principles of estoppel to public entities where to do so would negate requirements of law intended to protect the public interest." Phipps, 387 Mass. at 693. "The public interest in compliance with bidding procedures established by law overrides the equities that would appropriately be considered in a purely private transaction." Id. This result is reinforced by an uncompromising line of cases decided by the Massachusetts Supreme Judicial Court (SJC).

The SJC has consistently refused to allow equitable recovery to a plaintiff who has provided goods or services to a municipality in the absence of a contract complying with the material requirements of the public bidding laws. See, e.g., City of Lowell v.

---

[8]ISCO states that its principals felt duty-bound to deliver additional quantities of salt, "both morally and in the interest of future business relations."

Massachusetts Bonding & Ins. Co., 313 Mass. 257, 272 (1943) ("[O]ne who contracts with a city is bound at his peril to know the authority of the officer with whom he contracts to enter into the contract, and that a contract unlawfully entered into, though in good faith, creates no liability on the part of the city to pay for it, even in quantum meruit for goods furnished or labor performed. Contracts unlawfully entered into create no obligation on the part of a city, and payments thereon may be enjoined."); Adalian Bros. v. City of Boston, 323 Mass. 629, 632 (1949) ("It is also settled that limitations on the contracting power of municipal officers cannot be evaded by first rendering services or furnishing supplies without an express contract and then claiming under an implied contract for work performed or for goods sold and delivered. In such cases there is no implied contract."); Chicopee, 402 Mass. at 231-232 *and cases cited* (a party cannot evade the statutory requirements by rendering services or providing goods and subsequently seeking recovery based on alternative theories);[9] Massachusetts Gen. Hosp. v. City of Revere, 385 Mass. at 775-776 ("That the City may have benefitted by the [plaintiff's] actions is irrelevant to the issue. The statutes are controlling. The [plaintiff] is in no better position on a theory of quantum meruit. Where a contract is illegal by reason of failure to comply with statutory requisites, we will not allow recovery based on quantum meruit . . . [even ] good faith

---

[9]In Chicopee, plaintiff entered into a lease agreement with the City's Superintendent of Schools and its purchasing agent, and the school committee passed a resolution in favor of the agreement. The City Solicitor signed a form provided by plaintiff stating that the persons signing the lease had the authority to do so, and that the City could bind itself by signing the lease. The City tendered the first two of five annual payments of $24,000 each, and then made no more payments. 402 Mass. at 229. The SJC held that the City was not obligated to make any payments because the lease did not contain mayoral approval, and thus did not bind the City. Id. at 231. That the Mayor signed warrants authorizing the payment of the first two annual installments did not affect the outcome. Id.

rendering of services in such a situation does not warrant violation of a statutory arrangement."); Richard D. Kimball Co., 340 Mass. at 732 ("This is a harsh result, as there is no suggestion that the plaintiffs did not fully and faithfully perform the services requested of them. But, as we said earlier, one who contracts with a municipality can recover only if the statutory safeguards governing its contracting powers are satisfied. Any other rule, however appealing it may be in an individual case, would in the long run render such safeguards worthless; it would be another instance of a hard case making bad law.")[10]; Phipps, 387 Mass. at 694 ("Although the [defendant's] conduct would hardly qualify it for a 'sportsmanship' award and although [plaintiff] may reasonably conclude that it was treated most unfairly, a decision in [plaintiff's] favor would seriously threaten the integrity of the processes ordered by the Legislature.").

The court is bound by this line of precedent. Daigle v. Maine Med. Ctr., Inc., 14 F.3d 684, 689 (1st Cir. 1994). ("A federal court sitting in diversity jurisdiction and called upon in that role to apply state law is absolutely bound by a current interpretation of that law formulated by the state's highest tribunal."). The law is reluctant to apply the dictates of equity to sovereign entities in all but the most exceptional of circumstances. The Supreme Court has suggested the possibility that egregious "affirmative misconduct" by federal officials might give rise to a claim of estoppel. Office of Personnel Mgt. v. Richmond, 496 U.S. 414, 421 (1990). However, the Court noted that no decision had ever

---

[10] In that case, the SJC refused to find in favor of plaintiffs who had furnished architectural and engineering services to a school committee because there was no contract in writing between plaintiffs and the City, nor did letters between the parties and the Superintendent bear the written approval of the City Manager. 340 Mass. at 728.

defined what that conduct might consist of and that "we have reversed every finding [by the Courts of Appeals] of estoppel that we have reviewed." Id. at 422. The SJC has similarly stated its reluctance to apply estoppel to public entities because "deference to legislative policy should trump individual acts or statements of a government official that may be contrary to such policy. Otherwise, protections afforded the public interest are thwarted." Sullivan v. Chief Justice for Admin. and Mgt. of the Trial Court, 448 Mass. 15, 31 (2006).[11]

The lesson of this case – as with the others cited above – is that all those doing business with a municipality must take great care to understand the extent of a City official's contracting authority. In consumer law, the warning *caveat emptor* - "let the buyer beware"- is a commonplace. An apt corollary for those transacting business with a municipality is *caveat venditor* - "let the seller beware."

## ULTIMATE CONCLUSIONS OF FACT AND LAW

1. ISCO fully satisfied its obligations to the City by supplying 75,000 tons of salt at $36.42 per ton.

---

[11] The court's research has not located any case in which the SJC has applied equitable estoppel to rescue a contract held invalid under municipal bidding statutes. Even if the court were inclined to apply equitable estoppel to the instant matter, ISCO would not qualify. "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." Id. at 27-28. ISCO was told repeatedly and consistently by City officials that the City would not pay more than $36.42 per ton for the additional tonnage. This was made clear to ISCO by letter, in telephone conversations, and on the face of the three purchase orders. ISCO cannot credibly argue that it relied on any representation by a City official that it would be paid a higher per item price.

2. Any subsequent contractual agreement between the parties was invalid for failure to comply with the bidding requirements of Mass. Gen. Laws ch. 30B and the City Charter.

3. ISCO is chargeable with knowledge of these requirements.

4. ISCO has failed to meet its burden of proving compliance with the statutes and the City Charter.

5. The conduct of the parties is not excused by the emergency provisions of Mass. Gen. Laws, ch. 30B, § 8.

6. Accordingly, there is no enforceable contract under which ISCO is entitled to recover additional monies at law.

7. ISCO is not entitled in the alternative to recover in equity as the doctrine of estoppel does not apply.

8. Therefore, the City is not liable to ISCO.

## ORDER

For the foregoing reasons, the Clerk will enter judgment for the City of Boston. The case may then be closed.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE